# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO.03-11-00065-CV

**CenterPoint Energy Houston Electric, LLC, Appellant**

**v.**

**Public Utility Commission of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-10-000119, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

---

## O P I N I O N

This case involves judicial review of a Public Utility Commission (PUC) order disallowing part of a performance bonus that appellant CenterPoint Energy Houston Electric, LLC was entitled to for exceeding its 2008 energy-efficiency goals. The district court affirmed the PUC's order, but for the reasons we explain below, we will reverse the district court's judgment and remand the cause to the PUC for recalculation of CenterPoint's 2008 performance bonus and carrying costs.

## Background

CenterPoint, which owns and operates transmission and distribution facilities that deliver electricity to certain areas in Texas, is an electric utility governed by the Public Utility Regulatory Act (PURA). *See* Tex. Util. Code §§ 11.002, .004, 31.002(6); *see generally id*. §§ 11.001–66.016 (provisions of PURA). Under PURA, CenterPoint's rates, operations, and services are regulated by the PUC. *See id*. § 32.001(a). CenterPoint's rates, which are determined through contested-case hearings before the PUC, must be set at a level that accounts for its costs of

providing service plus a reasonable rate of return on its investment. *See id.* §§ 36.001(a), 39.051. Of relevance here, CenterPoint's costs of providing service include its mandatory expenditures on energy-efficiency programs designed to meet the Legislature's goal of reducing energy consumption in Texas. *See id.* § 39.905 ("Goal for Energy Efficiency").

Since 1999, PURA has included a provision establishing energy-efficiency goals designed to reduce Texas customers' energy consumption. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543, 2600 (codified at Tex. Util. Code § 39.905).[1] These energy-efficiency goals consist of specified reductions—i.e., a slowing—in the anticipated growth in demand for electricity through energy-savings incentive programs administered by the electric utilities. *See* Tex. Util. Code § 39.905(a)(3). In 2007, the Legislature amended section 39.905 to increase the energy-efficiency goals and to direct the PUC to adopt rules and procedures to facilitate meeting these goals. *See* Act of May 28, 2007, 80th Leg., R.S., ch. 939, § 22, sec. 39.905, 2007 Tex. Gen. Laws 3241, 3248 (codified at Tex. Util. Code § 39.905(a)–(b)). Specifically, the Legislature directed the PUC to create a mechanism to ensure that the cost of meeting these goals was passed

---

[1] This provision was included as part of the Legislature's 1999 restructure and partial deregulation of the electric industry in Texas. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543, 2558–2602 (codified at Tex. Util. Code §§ 39.001–.916); *see also City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231 (Tex. 2001) (describing legislation in detail); *State v. Public Util. Comm'n*, 246 S.W.3d 324 (Tex. App.—Austin 2008, pet. denied) (same); *Office of Pub. Util. Counsel v. Public Util. Comm'n*, 185 S.W.3d 555 (Tex. App.—Austin 2006, pet. denied) (same). Because the generating companies and retail electric providers had to use the existing power lines to move electricity from the plant to the retail customer's home or business, the 1999 legislation regarded transmission and distribution utilities like CenterPoint as regulated monopolies within their respective service areas and mandated that their rates continue to be regulated by the PUC. *See* Tex. Util. Code § 39.001(a), (b).

through to ratepayers in a timely fashion and to establish an incentive to reward utilities for exceeding the energy goals:

> The commission shall provide oversight and adopt rules and procedures to ensure that the utilities can achieve the goal of this section, including:
>
> (1)     establishing an energy efficiency cost recovery factor for ensuring timely and reasonable cost recovery for utility expenditures made to satisfy the goal of this section;
>
> (2)     establishing an incentive under Section 36.204 to reward utilities administering programs under this section that exceed the minimum goals established by this section;
>
> . . . .

Tex. Util. Code § 39.905(b).

In response to this legislative directive, the PUC repealed and amended its prior rule 25.181 to create an energy efficiency cost recovery factor (EECRF) and to establish a performance bonus to reward utilities that exceeded the energy-efficiency goals. *See* 33 Tex. Reg. 3585 (2008) (proposed Nov. 2, 2007) (codified at 16 Tex. Admin. Code § 25.181). PUC rule 25.181 emphasizes that its purpose, like that of PURA section 39.905, is to ensure that electric utilities administer energy-efficiency programs that are available to utility customers and, in furtherance of meeting the energy-reduction goals set forth in the rule, that the electric utilities provide incentives for customers to acquire cost-effective energy efficiency. *See* 16 Tex. Admin. Code § 25.181(a) (Public Util. Comm'n, Energy Efficiency Goal) (2008).[2] The rule specifies that the incentives be

---

[2] All citations to PUC rule 25.181 are to the version that went into effect as of May 4, 2008, which is the version that was in effect when the PUC issued its order in this case. *See* 33 Tex. Reg. 3585, 3630 (2008) (proposed Nov. 2, 2007) (codified at 16 Tex. Admin. Code § 25.181) (establishing effective date of May 4, 2008).

provided through "market-based standard offer programs or limited, targeted, market-transformation programs." *See id.* § 25.181(a)(3).[3] To recover the costs expended on these energy-efficiency programs, the rule allows a utility to apply to the PUC to establish through a ratemaking proceeding an EECRF "to timely recover the reasonable costs of providing energy efficiency programs." *See id.* § 25.181(f). And for those utilities that exceed the demand-reduction goal set forth in subsection (e) of the rule, the rule mandates that they be awarded a performance bonus based on the utility's energy-efficiency achievements for the previous calendar year. *See id.* § 25.181(h). That performance bonus is a capped percentage share of the net benefits realized in meeting the energy-reduction goals. *See id.* But, of particular relevance here, "[t]he bonus calculation shall not include demand or energy savings that result from programs other than programs implemented under this [rule]." *Id.*

During 2008, CenterPoint implemented fourteen energy-efficiency programs, all of which were the type of programs required by PUC rule 25.181—specifically, they were all market-transformation or standard offer programs. At that time, the PUC-approved rates for CenterPoint, which derived from a 2001 PUC-approved rate tariff with CenterPoint's residential, commercial, and industrial ratepayers, were designed to generate $23 million in revenues for energy-efficiency programs, with $13 million of that amount coming from its 2001 PUC-approved rate and $10 million from the terms of a 2006 settlement agreement between CenterPoint and certain of its customers.[4] The 2006 settlement agreement resulted from a contested rate case in which the PUC determined that CenterPoint was over-collecting revenues by approximately $68 million—i.e., CenterPoint's then-

---

[3] The rule contains more detailed information. *See* 16 Tex. Admin. Code § 25.181.

[4] For ease of reading, we have rounded the exact amounts, which are $22,925,492 (total) and $12,925,492 (2001 approved rates).

current base rates collected $68 million more in revenue than CenterPoint needed to regain its costs plus a reasonable rate of return. In the settlement agreement, the parties agreed that $5 million of the over-collected $68 million would be allocated to CenterPoint's wholesale customers through a base-rate reduction that lowered CenterPoint's revenues by $5 million per year. The remaining $63 million would be allocated to its retail customers, but instead of a corresponding base-rate reduction equaling $63 million per year, the parties agreed that CenterPoint's yearly revenues would be reduced by $53 million and that CenterPoint would invest an additional $10 million in energy-efficiency programs. More specifically, the parties agreed—

> CenterPoint Houston shall spend not less than $10 million (including costs of administering the programs) in addition to the $13 million of energy efficiency program costs used in setting CenterPoint Houston's existing rates for a total of approximately $23 million.

So instead of reducing their annual rates by an additional $10 million, CenterPoint's residential and commercial customers agreed that CenterPoint would continue to collect the $10 million annually through its base rates, but CenterPoint in turn agreed to spend that $10 million on additional, specifically designated energy-efficiency programs. CenterPoint also agreed to include separate line-item designations in its annual energy-efficiency plan reports regarding how it spent this $10 million. *See* 26 Tex. Admin. Code § 25.181(m) (requiring utility to file annual energy-efficiency plan and report). Thus, once the PUC approved the settlement agreement, CenterPoint's rates were set at a level designed to collect $23 million in revenues designated for energy-efficiency programs.

During 2008, however, CenterPoint spent more than $23 million on energy-efficiency programs—specifically, it spent $1.3 million more, or $24.3 million total.[5] And by all accounts,

---

[5] The exact amounts are $1,344,530 and $24,270,022 respectively.

5

CenterPoint's 2008 energy-efficiency programs were extremely successful. Not only did CenterPoint meet its target of a 15% reduction in the annual growth of electricity demand, its programs actually reduced demand growth by 30%, which was 200% of its 2008 energy-efficiency goal. *See id.* § 25.181(e). This reduction translated into a savings of approximately $83.4 million to CenterPoint's residential and commercial ratepayers.

In May 2009, CenterPoint filed an application with the PUC requesting approval of a new EECRF that would serve as a rider to CenterPoint's then-existing base rates to allow it to recover the extra $1.3 million it had spent on energy efficiency programs and also to collect the performance bonus it was entitled to for exceeding its 2008 energy-efficiency goals. In the application, CenterPoint claimed it was entitled to a performance bonus of $4.85 million,[6] which it calculated using the formula set forth in PUC rule 25.181. *See id.* § 25.181(h) (providing performance bonus based on capped percentage of net energy-efficiency savings). The calculation of the bonus begins with the amount of net savings, here $83.4 million, realized by CenterPoint's customers—i.e., the sum of total avoided cost associated with the eligible programs administered by the utility minus the sum of all program costs. *See id.* § 25.181(h)(2). The maximum bonus a utility can receive under the rule is 1% of net benefits for every 2% that the utility exceeds its target, further capped at 20% of the utility's program costs. *Id*. § 25.181(h)(3). Here, because CenterPoint exceeded its goals by 100%, it calculated that it was entitled to a maximum of 50% of the net benefits, or approximately $41.7 million, which amount is further capped at 20% of CenterPoint's total energy-efficiency program costs. *See id.* CenterPoint calculated its total energy-efficiency costs using the $13 million from its 2001 PUC-approved rate, the $10 million from its 2006 settlement

---

[6] The exact amount is $4,854,004.

agreement, and the $1.3 million it spent in excess of its designated amounts, for a total of $24.3 million. The result of CenterPoint's calculations was a performance bonus of $4.85 million—i.e., 20% of its $24.3 million in expenditures on energy-efficiency programs. Because it was subject to a rate freeze under the 2006 settlement agreement, however, CenterPoint also sought in its application to defer implementation of its EECRF until July 2010 when its then-current rate freeze expired and, in conjunction with that, requested $154,269 in carrying costs—i.e., interest on the deferred performance-bonus amount—for the deferral period between January 1, 2010 until the EECRF became effective. *See* Tex. Util. Code § 39.905(b)(3) (allowing deferral); 16 Tex. Admin. Code § 25.181(f)(7) (allowing deferral and for recovery of interest on deferred amount).

The Office of Public Utility Counsel (OPC) requested a hearing on CenterPoint's EECRF application, so the PUC referred the matter to the State Office of Administrative Hearings for a contested-case hearing. The parties to the contested-case hearing agreed that CenterPoint was entitled to a performance bonus for exceeding energy-efficiency goals, but PUC staff, the OPC, and Texas Industrial Energy Consumers (TIEC)[7] asserted that it would be inequitable and contrary to the law to include the $10 million that was required to be spent on energy-efficiency programs under the settlement agreement in the calculation of CenterPoint's bonus computation because the ratepayers provided the $10 million and because inclusion is contrary to PUC regulations. Instead, OPC and TIEC urged, CenterPoint's bonus should be calculated using $14.3 million as the amount of program expenditures—i.e., the total energy-efficiency program expenditures less the $10 million from the settlement agreement that was also spent on those programs—which yields a $2.85 million performance bonus. After the parties submitted the case on briefs and filed evidence with the

---

[7] TIEC is a voluntary association of companies that operate industrial facilities in Texas. *See City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 257 (Tex. 2001).

administrative law judge regarding the contested issues, which included the proper allocation of the $10 million in calculating the performance bonus, the administrative law judge issued a proposal for decision, most of which the PUC adopted in its final order. Specifically of relevance here, the PUC's final order concluded—

- "CenterPoint is entitled to a performance bonus" under PUC rule 25.181(h);

- "[PUC rule 25.181(h)] excludes from the calculation of a performance bonus the demand or energy savings that result from programs other than programs implemented pursuant to Rule 25.181."

- "The settlement energy-efficiency program approved by the [PUC in the 2006 settlement agreement] is a program not implemented under [PUC rule 25.181] and must therefore be excluded from the calculation of CenterPoint's performance bonus."

- CenterPoint's 2008 performance bonus is "20 percent of the statutory energy-efficiency program cost which CenterPoint reports as $14,271,681. The resulting performance bonus from this calculation is $2,854,336."

- Based on the recalculation of the performance bonus, CenterPoint's carrying costs are $123,049.

After exhausting its administrative remedies, CenterPoint filed this suit for judicial review in Travis County district court to overturn the PUC's decision regarding the performance bonus. *See* Tex. Gov't Code § 2001.171 (authorizing judicial review of agency decision after administrative remedies exhausted). CenterPoint's principal argument was that the PUC's decision to partially deny the bonus violated PURA section 39.905 and PUC rule 25.181 because all of CenterPoint's energy-efficiency programs, including those funded by the settlement agreement, were implemented under PUC rule 25.181 and thus should be included in calculating its performance bonus. The PUC argued in response that because CenterPoint had agreed to expend $10 million on energy-efficiency programs under the terms of its 2006 settlement agreement, the portions of its

8

programs supported by that $10 million were not "programs implemented under [PUC rule 25.181]," and thus could not be included in the calculation of its performance bonus. After a bench trial on the matter, the district court issued a final judgment affirming the PUC's final order. CenterPoint now appeals.

## Discussion

CenterPoint raises two issues on appeal. In the first, it argues that the PUC's partial denial of CenterPoint's performance bonus violates PURA and PUC rules because all of CenterPoint's 2008 energy-efficiency programs were "implemented under" PURA section 39.905 and PUC rule 25.181. In its second issue, which depends on a favorable resolution of its first, CenterPoint asserts that it was error for the PUC to reduce CenterPoint's carrying costs.

### Standard of review

This appeal concerns a suit for judicial review of a final agency decision in a contested case. In general, our review of the PUC's order is governed by section 2001.174 of the Administrative Procedure Act. *See* Tex. Util. Code § 15.001; Tex. Gov't Code § 2001.174. This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are

> (A)  in violation of a constitutional or statutory provision;
>
> (B)  in excess of the agency's statutory authority;
>
> (C)  made through unlawful procedure;
>
> (D)  affected by other error of law;

9

(E)     not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2). Here, there are no underlying fact disputes, only a dispute over the PUC's interpretation of its rule 25.181. Thus, this case raises a question of rule construction, which we review de novo. *See Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). We interpret administrative rules, like statutes, under traditional principles of statutory construction. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011); *Rodriguez*, 997 S.W.2d at 254. Accordingly, our primary objective is to ascertain and give effect to the agency's intent and, ordinarily, the truest manifestation of what the agency intended is what it enacted. *See First Am. Title Inc. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008) (discussing principles of statutory construction); *Rodriguez*, 997 S.W.2d at 254 ("Unless the rule is ambiguous, we follow the rule's clear language."). If the rule is ambiguous or leaves room for policy determinations, we defer to the agency's interpretation, but not where the administrative interpretation is plainly erroneous or inconsistent with the regulation or its underlying statutes. *Rodriguez*, 997 S.W.2d at 254–55 (quoting *Public Util. Comm'n of Tex. v. Gulf States Util. Co.*, 809 S.W.2d 201, 207 (Tex. 1991)). If an agency has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. *See Rodriguez*, 997 S.W.2d at 255.

**Programs implemented under rule 25.181**

The PUC's final order partially reduced CenterPoint's 2008 performance bonus based on the PUC's interpretation of the phrase "implemented under [rule 25.181]" found in subsection (h) of that rule. *See* 16 Tex. Admin. Code § 25.181(h) ("The bonus calculation shall

not include demand or energy savings that result from programs other than programs *implemented under this section*.") (emphasis added). Specifically, the PUC concluded in its order that the energy-efficiency programs funded with the $10 million from the settlement-agreement were programs "not implemented under [rule 25.181]," and thus could not be included in the performance bonus calculation. *See id*. Instead, the PUC determined that only the programs funded with the $14.3 million of CenterPoint's "statutory program funding"—i.e., the money from CenterPoint's base rates originally designated for energy-efficiency programs plus the extra $1.3 million CenterPoint spent on energy-efficiency programs—were programs "implemented under [rule 25.181]" that could be included in the performance-bonus calculation. Emphasizing that we must defer to its interpretation of PURA and its own rules, the PUC argues on appeal it was appropriate for it to consider the source of a program's funding to determine whether the program is "implemented under" PUC rule 25.181 because that undefined phrase limits the performance bonus based on the specific source of funds expended on the energy-efficiency programs. We disagree.

While it is technically true that the phrase "implemented under" as it is used in rule 25.181(h) creates a limit—i.e., confining application of subsection (h)'s calculation to only those programs "implemented under" the rule—the PUC's position here unnecessarily complicates what is fairly standard statutory and regulatory language.[8] "Implement" simply means "carry out." *See, e.g.*, *Webster's Third New Int'l Dictionary* 1134 (2002). In the statutory and regulatory context, this

---

[8] Our research revealed several statutes and rules that use the phrase "implemented under" in this context. *See generally, e.g.*, Tex. Gov't Code §§ 411.381(11), 531.024171(d), 536.203, 536.205; Tex. Educ. Code § 39.233; Tex. Health & Safety Code §§ 363.063(d), 382.209(f); Tex. Parks & Wild. Code § 11.081(5); 1 Tex. Admin. Code § 210.1 (2013) (Dep't of Info. Resources, Applicable Terms and Technologies for State Electronic Portal); 30 Tex. Admin. Code § 114.661 (2013) (Tex. Comm'n on Envtl. Quality, Criteria for Prioritizing Facilities Eligible to Receive Grant); 31 Tex. Admin. Code § 25.1(8) (2013) (General Land Office, Definitions).

phrase is used as a sort of short-hand reference to the general contents or substance of the statute or rule to which it refers. And although its use does "limit," it does not create the type of uncertainty or require the scrutiny that the PUC's interpretation here suggests. Rather, the proper application of the phrase "implemented under [rule 25.181]" simply requires a plain-meaning review of rule 25.181 and application of that plain meaning to the programs in question.

The plain and unambiguous text of rule 25.181 shows that its purpose is to achieve the Legislature's overarching goal of improving energy efficiency in Texas by requiring electric utilities like CenterPoint to administer certain types of energy-efficiency programs to achieve a set percentage reduction—15% in 2008, *see* 16 Tex. Admin. Code § 25.181(e)—in the utility's annual growth demand of residential and commercial customers. *See id.* § 25.181(a). The energy-efficiency programs provided by utilities under this rule must be of three specific types:

> [E]ach electric utility annually provides, *through market-based standard offer programs, or limited, targeted, market-transformation programs*, incentives sufficient for retail electric providers and competitive energy service providers to acquire additional cost-effective energy efficiency for residential and commercial customers . . . .

*Id.* § 25.181(a)(3) (emphases added); *see also* Tex. Util. Code § 39.905(a)(3) (specifying same programs). And to encourage utilities' full involvement in the energy-efficiency goals, the rule creates a mechanism that allows utilities to recoup the costs expended on the programs and, for those utilities that exceed the rule's goals, mandates a bonus based on the net savings achieved. *See* 16 Tex. Admin. Code § 25.181(f), (h). The remaining terms of the rule, although important, deal with matters ancillary to the above, such as a cost-effectiveness standard, incentive payments to energy-efficiency providers, administration costs, penalties, and reporting, review and inspection

requirements. *See generally id.* § 25.181(c)–(u). So at its core, rule 25.181 sets the minimum energy-efficiency goals that utilities must meet annually, requires that they meet these goals by providing incentives through two specifically identified types of programs, allows for the utilities to recover the costs of the programs, and mandates a bonus for those utilities exceeding their energy goals. Thus, under a plain-meaning review of rule 25.181, a program is implemented or carried out under the rule if it is a "market-based standard offer program or a limited, targeted, market-transformation program" that is provided or administered by a utility to achieve the energy efficiency goals of the rule.

Here, it is undisputed that all of the 2008 energy-efficiency programs, including the ones funded with the $10 million from the 2006 settlement agreement, were administered by CenterPoint, were market-based standard offer programs or targeted market-transformation programs that were provided to achieve, and did achieve according to PUC's order, cost-effective energy efficiency for CenterPoint's customers. In fact, CenterPoint's administration of these programs resulted in a reduction in demand that significantly exceeded the rule's minimum goals. Accordingly, these programs were "programs implemented under [rule 25.181]" and, as such, the savings from these programs should be included in the calculation of the performance bonus that CenterPoint is entitled to for exceeding its energy-efficiency goals.

The PUC advances several arguments to support its conclusion that the CenterPoint energy-efficiency programs funded with money from the settlement agreement are not "programs implemented under [rule 25.181]," but these arguments are inconsistent with the rule's text and are thus unpersuasive.

13

### 1. *Whether the programs funded by $10 million were necessary to meet goals*

In the proceedings that led to the 2006 settlement agreement, the PUC determined that CenterPoint's then-existing rates created more revenue—specifically $68 million more—than CenterPoint needed to earn a profit and recover its reasonable and necessary expenses, including those for energy-efficiency programs. Thus, CenterPoint could have funded its energy-efficiency programs sufficiently to meet its demand-reduction goals even in the absence of the $68 million in revenue. Therefore, the PUC argues, because the $10 million at issue in this case was part of that $68 million of excess revenue, the energy-efficiency programs funded by that amount were not necessary for CenterPoint to meet its goals. Stated another way, the PUC argues that the programs funded by the $10 million were in addition to what was required by rule or statute to meet energy-efficiency goals and, as such, they were not "implemented under [rule 25.181]." We disagree.

There is no textual support in the rule, or its enabling statute, for the conclusion that programs are implemented under the rule only to the extent that they meet the minimum energy efficiency goals. Likewise, there is nothing in the text of the rule to support the related argument that expansion of existing energy-efficiency programs beyond what is required to meet the rule's minimum goals cannot be part of a "program implemented under [rule 25.181]." To the contrary, PURA's stated purpose in directing the PUC to create a performance bonus is "to reward utilities administering programs under [section 39.905] that *exceed* the minimum goals established by [section 39.905]." *See* Tex. Util. Code § 39.905(b)(2). And the rule, which tracks the Legislature's purpose, grants such a performance bonus to those utilities that *exceed* their minimum demand and energy reduction goals. *See* 16 Tex. Admin. Code § 25.181(h). Thus, the statutory and regulatory energy-efficiency scheme at issue here actually encourages the expansion of the energy-efficiency programs beyond the minimum energy-efficiency goals. Likewise encouraging is the rule's EECRF

14

provision, which provides a mechanism that allows a utility to recover the full costs of providing its portfolio of energy-efficiency programs. *See id.* § 25.181(f)(4), (6) (allowing EECRF adjustment to permit recovery of past under-recovered energy-efficiency program costs). Those costs are limited only by the requirement that they be reasonable, *see id.* § 25.181(f), and not in excess of the stated percentage caps, *see id.* § 25.181(f)(8). Thus in this case, because it had spent more money on energy-efficiency programs than was forecast in its rates, CenterPoint requested and the PUC order approved an EECRF rate rider designed to recover the energy-efficiency expenses that CenterPoint incurred *in excess* of the estimated expenditures covered by its existing base rates.

### 2. *Whether the $10 million belonged to CenterPoint's ratepayers, not CenterPoint*

In another argument, the PUC characterizes the $10 million from the settlement agreement as a "gift" or "grant" from CenterPoint's commercial and residential ratepayers to be dedicated to expanding energy-efficiency programs. As such, the PUC asserts, the programs funded by this amount were not provided by CenterPoint to comply with its statutory and regulatory energy-efficiency goals and, as a result, were not "implemented under [rule 25.181]." Again, we disagree.

First, we would disagree with the PUC's characterization of the $10 million as a gift or grant. This amount was part of a negotiated agreement to settle a contested PUC rate case in which several different parties participated, and we will not second guess the purposes or motives behind such a settlement agreement. But regardless, in the absence of textual support for the contention that a utility must provide the funds from its rate-designated revenue, we fail to see how the source of funding for these programs affects whether the programs were carried out to comply with the Legislature's energy-efficiency goals. Ultimately, all utilities' costs, including those for energy-efficiency programs, are funded by ratepayers, *see* Tex. Util. Code § 36.051 (establishing

15

rates), and we fail to see how the intermediate source of the funding informs our decision here. This is best illustrated by the fact that the effect of PUC's approval of the settlement agreement was to set CenterPoint's rates such that they recovered $23 million—not $13 million—designated for energy-efficiency programs. Further, these programs exist to achieve the overarching purpose of the statutory and regulatory scheme at issue here—i.e., energy-efficiency. Thus, the rule does not distinguish between intermediate funds and ratepayer funds, but only whether the funds were spent on the programs required by the rule, the programs were administered by CenterPoint, and the programs actually achieved energy-efficiency.

Relatedly, the PUC argues that the $10 million cannot be considered in the calculation of CenterPoint's performance bonus because the programs funded by that amount did not "cost" CenterPoint anything. *See* 16 Tex. Admin. Code § 25.181(h)(2) (defining "net benefit," which is element of performance bonus, as sum of total avoided costs minus the "sum of all program costs"). Stated another way, the PUC contends that because CenterPoint did not have to pay for the expansion of the programs out of its own funds, that part of those programs was not "implemented under [rule 25.181]". First, we would note that CenterPoint collected the $10 million in the same manner that it collected the other money spent on energy-efficiency programs—i.e., through its PUC-approved rates. Further, the rule's description of the calculation simply references "program costs" without limitation. *See id.* § 25.181(h)(2). To that extent, the rule offers no textual support for the PUC's argument here. And, as noted previously, the PUC's focus on the source of funds in this context is a distinction without a difference given that CenterPoint's ratepayers ultimately pay all the utility's costs, one way or the other. For this same reason, although not raised by the PUC here, we would note that the rule's reference to "the *utility's* program costs" in the rule's 20% cap, *see id.* § 25.181(h)(3) (emphasis added) (capping bonus at "20% of the utility's program costs"), does not

16

inform our decision here. In sum, there is nothing in the rule to preclude inclusion of the cost of these programs based simply on the intermediate source of funds for those costs.

### 3. Other programs

The PUC also argues that its treatment of the $10 million is appropriate here because it mirrors subsection (p)'s treatment of weatherization programs for low-income customers:

> Targeted low income *energy efficiency program*. Unless *funding* is *provided under PURA § 39.903*, each unbundled transmission and distribution utility shall include in its energy efficiency plan a targeted low-income energy efficiency program as described by PURA § 39.903(f)(2). A utility in an area in which customer choice is not offered may include in its energy efficiency plan a targeted low-income energy efficiency program that utilizes the cost-effectiveness methodology provided in paragraph (2) of this subsection. Savings achieved by the program shall count toward the utility's energy efficiency goal.

*Id.* § 25.181(p) (emphases added). Although it does not explain its basis for this argument and that basis is not immediately obvious from text of subsection (p), we infer that the PUC's argument here stems from subsection (p)'s reference to, as emphasized above, the "funding" of energy-efficiency programs "provided under PURA § 39.903." *See id*. But subsection's (p)'s reference here does not support the PUC's interpretation of subsection (h) to allow an inquiry into the source of an energy-efficiency program's funds to determine whether that program was "implemented under [rule 25.181]." *See id.*

Subsection (p) of PUC rule 25.181 requires utilities to provide weatherization programs for low-income customers unless PURA section 39.903 provides the funding for such a program. *See id.* It also specifies that any savings achieved by a weatherization program provided by the utility count towards the utility's energy-efficiency goals. *See id.* The PURA provision referenced in subsection (p) authorizes funding from an account in the general revenue fund for

17

programs benefitting certain low-income electric customers, including "targeted energy efficiency programs to be administered by the Texas Department of Housing and Community Affairs in coordination with existing weatherization programs." *See* Tex. Util. Code § 39.903(f)(2). So read together, if the Department of Housing and Community Affairs administers a weatherization program funded under PURA section 39.903(f)(2), the utility servicing those customers does not need to provide such a program. *See id.*; 16 Tex. Admin. Code § 25.181(p). If the Department does not administer such a weatherization program, however, the utility must provide the program and is credited for any subsequent energy savings. *See* 16 Tex. Admin. Code § 25.181(p). But contrary to the PUC's implied assertion here, the focus of this scheme is not on the source of funding, but instead on which entity actually administers the weatherization program. *See* Tex. Util. Code § 39.903; 16 Tex. Admin. Code § 25.181(p). Thus, a utility administering a weatherization program under subsection (p)—i.e., where the Department is not doing so under PURA section 39.903—is credited for any savings resulting from that weatherization program not because of how the program is funded, but because the utility, not the Department, actually administered the program. Conversely, a utility, in whose service area the Department administers a weatherization program under PURA section 39.903, is not credited with any savings resulting from that program because the Department, not the utility, administers the program. To that extent, subsection (p)'s treatment of the weatherization programs, instead of supporting the PUC's position in this case, is consistent with our holding here that "programs implemented under [rule 25.181]" are "market-based standard offer programs, targeted market-transformation programs, or utility self-delivered programs" *administered by utilities* to achieve a reduction in demand growth.

In a related argument, the PUC offers its rule regarding advanced metering systems as further support for its focus on the source of a program's funding in rule 25.181. *See* 16 Tex.

Admin. Code § 25.130 (2013) (Pub. Util. Comm'n, Advanced Metering).[9] The advanced-metering rule regulates utilities' use of advanced meters and allows those utilities that choose to adopt advanced metering systems to assess a surcharge to recover costs incurred for deploying the systems. *See id.* Although use of advanced meters can result in decreased demand for electricity because, among other reasons, they allow users to directly monitor and control their energy consumption, utilities may not include these savings in their bonus calculation because the advanced-meter program is carried out—i.e., implemented—under rule 25.130, not 25.181. *See id.* § 25.181(h). The PUC somehow extrapolates from this result that because the excluded savings are from programs funded through a surcharge, it should consider the source of a program's funding in determining whether the program is implemented under rule 25.181. But the savings from advanced metering programs are not included in a performance bonus because those programs are implemented under rule 25.130, not because they are funded differently than energy-efficiency programs. Further, the purpose behind advanced metering systems is not to promote energy efficiency, as is rule 25.181's purpose, but "to increase the reliability of the regional electrical network, encourage dynamic pricing and demand response, make better use of generation assets and transmission and generation assets, and provide more choices for consumers." *See* Act of May 29, 2005, 79th Leg., R.S., ch. 1095, § 8, 2005 Tex. Gen. Laws 3615, 3618.

In sum, we hold that under PUC rule 25.181's plain language, CenterPoint's 2008 energy-efficiency programs, including those funded with money from the 2006 settlement agreement,

---

[9] Advanced meters, which are part of "Smart Grid Technology" and are often referred to as "smart meters," are digital meters that offer two-way, real-time communication between a metered location and the electric utility. *See* Sonia K. McNeil, *Privacy and the Modern Grid*, 25 Harv. J.L. & Tech. 199, 200 (2011). They also allow users to monitor and remotely control their electrical use. *See id.*

were programs "implemented under [rule 25.181]" because they were "market-based standard offer programs or limited, targeted, market-transformation programs" provided or administered by an electric utility to achieve the rule's energy-efficiency goals. The PUC, by limiting CenterPoint's performance bonus based on the specific source of funds expended on the energy-efficiency programs," rather than based on the above, adopted an interpretation that is contrary to the rule's plain language. Thus, the PUC's actions here were arbitrary and capricious and require reversal. *See Rodriguez*, 997 S.W.2d at 254–55 ("If the Commission does not follow the clear, unambiguous language of its own regulation, we reverse its action as arbitrary and capricious."). Accordingly, we sustain CenterPoint's first issue.

**Carrying costs**

In its second issue, CenterPoint asserts that because the PUC erred in reducing CenterPoint's performance bonus as discussed above, it was likewise error for it to reduce CenterPoint's carrying costs. *See* 16 Tex. Admin. Code § 25.181(f)(7) (providing that utility that is subject to a rate freeze, as CenterPoint was here, is entitled to defer recovery of its costs until after the rate freeze expires, and those deferred costs bear interest). The PUC, although disagreeing that it erred in partially denying CenterPoint's performance bonus, agrees that a proper calculation of CenterPoint's carrying costs depends on the correct amount of its performance bonus. Accordingly, because the PUC's calculation of CenterPoint's carrying costs was improperly based on its award of a partial performance bonus, CenterPoint is entitled to a recalculation of its carrying costs under rule 25.181(f)(7).

We sustain CenterPoint's second issue.

## Conclusion

Having sustained both of CenterPoint's issues on appeal, we reverse the district court's judgment. We likewise reverse the parts of the PUC's order regarding CenterPoint's 2008 performance bonus and carrying costs and remand this cause to the PUC for recalculation of those amounts consistent with this opinion.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose, and Goodwin

Reversed and Remanded

Filed:   August 16, 2013