

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| CITY OF SAN ANTONIO acting by and through City Public Service Board a/k/a CPS ENERGY, | § | No. 08-14-00199-CV |
| Appellant, | § | Appeal from the |
| v. | § | 261st District Court |
| PUBLIC UTILITY COMMISSION OF TEXAS, | § | of Travis County, Texas |
| Appellee. | § | (TC# D-1-GV-13-000988) |

## **O P I N I O N**

The City of San Antonio, acting by and through City Public Service Board a/k/a CPS Energy (CPS Energy), appeals a district court judgment affirming a final order of the Public Utility Commission of Texas (PUC), in which the PUC imposed a $25,000 administrative penalty on CPS Energy for violating the PUC's Wholesale Market Oversight Rule (the WMO Rule). CPS Energy raises several challenges to the validity of the PUC's final order, contending, among other things, that the PUC misinterpreted the WMO Rule, that its application of the WMO Rule deprived CPS Energy of due process, and that the PUC's final order was not supported by substantial evidence. We affirm.[1]

---

[1] This case was transferred from the Third Court of Appeals in Austin, and we decide it in accordance with the

**BACKGROUND**

In order to address the dispute over the proper interpretation and application of the WMO Rule, it is necessary to understand the nature of the electricity market in Texas. Prior to the adoption of Chapter 39 of the Texas Utilities Code, also known as the Public Utility Regulatory Act or PURA, the electricity market in Texas essentially operated as a monopoly. *TXU Generation Co., L.P. v. Pub. Util. Comm'n of Texas,* 165 S.W.3d 821, 827 (Tex.App. – Austin 2005, pet. denied). When it enacted PURA, the Texas Legislature made the determination to deregulate the production and sale of electricity for a large portion of the state, but chose not to deregulate the "transmission of energy." TEX. UTIL. CODE ANN. § 39.001 (West 2016). In carving out an exception for the transmission of energy, the Legislature recognized that this aspect of the electricity industry is unique, and by its nature must be subject to some form of regulation. *TXU Generation Co., L.P.,* 165 S.W.3d at 827. In particular, the Legislature recognized that because electricity cannot be easily stored once it is generated, the industry must rely on a complex transmission grid to provide needed energy to consumers throughout the state. In turn, it recognized that the grid must be constantly balanced by either adding or removing power to ensure a smooth and uninterrupted flow of energy to consumers, and that it was therefore necessary to assign an entity to be responsible for ensuring that balance. *Id.* at 828.

The Legislature assigned the task of overseeing and regulating this aspect of the industry to the PUC. TEX. UTIL. CODE ANN. § 35.004 (West 2016). As part of its authority, the PUC is authorized to certify independent organizations to perform various functions on its behalf to ensure the "reliability and adequacy of the regional electrical network" within a particular power region. *Id.* at § 39.151(a), (c) (West 2016). For most of the state, that independent organization is the

precedent of that Court to the extent required by TEX. R. APP. P. 41.3.

Electric Reliability Council of Texas (ERCOT), which manages the flow of electric power to approximately 23 million Texas customers within its region. *TXU Generation Co. L.P.,* 165 S.W.3d at 831.

The Utilities Code also authorizes independent organizations, such as ERCOT, to adopt rules, subject to the PUC's oversight and review, to ensure the reliability of the electrical grid within its region. TEX. UTIL. CODE ANN. § 39.151(d) (West 2016). Those rules are commonly referred to as ERCOT "protocols." 16 TEX. ADMIN. CODE § 25.503(c)(3). The various entities, such as CPS Energy, that choose to participate in the transmission of energy within the ERCOT region are referred to as "market participants" and are subject to those protocols. *Id*. at § 25.503(c)(5, 6). In particular, the Code provides that market participants must observe all ERCOT rules and procedures, and that a failure to comply may, among other things, result in an enforcement action and ultimately the imposition of an administrative penalty. TEX. UTIL. CODE ANN. § 39.151(j) (West 2016).

In turn, ERCOT is required to contract with an entity selected by the PUC to act as the PUC's "wholesale electric market monitor" to prevent and detect violations of the ERCOT protocols. *Id*. at § 39.1515 (West 2016). ERCOT contracted with Texas Reliability Entity, Inc. ("Texas RE") to investigate potential ERCOT protocol violations and report those violations to PUC staff.

Also as part of its duty to oversee and monitor the various participants in this aspect of the electricity industry, the PUC adopted a global administrative rule, entitled the "Oversight of Wholesale Market Participants," more commonly known as the "WMO Rule," which has the stated purpose of establishing "the standards that the [PUC] will apply in monitoring the activities"

3

of these participants. 16 TEX. ADMIN. CODE § 25.503. The WMO Rule sets forth various duties of market participants, and in particular, requires that each "market participant shall be knowledgeable about ERCOT procedures," and expressly requires all market participants to "comply with ERCOT procedures and any official interpretation of the Protocols issued by ERCOT or the [PUC]." *Id.* at § 25.503 (f)(1) and (2).

The WMO Rule nevertheless provides in subsection (f) that a market participant may be "excused" from compliance with ERCOT instructions or Protocol requirements under the following relevant circumstances:

- When such non-compliance is due to communication or equipment failure beyond the reasonable control of the market participant;

- When compliance would jeopardize public health and safety or the reliability of the ERCOT transmission grid, or create risk of bodily harm or damage to the equipment;

- When compliance would be inconsistent with facility licensing, environmental, or legal requirements[.]

*Id.* at § 25.503(f)(2)(C). The Rule, however, states that the market participant is excused under this subparagraph only for so long as the condition continues. *Id.*

In addition, the WMO Rule contains a separate section providing two affirmative defenses to any prohibited act set forth in subsection (f) of the Rule. *Id*. at § 25.503(h). In particular, subsection (h) of the WMO Rule provides that a market participant may avoid liability for engaging in an act prohibited by the Rule, if the participant establishes that: (1) its "conduct served a legitimate business purpose . . . and that it did not know, and could not reasonably anticipate, that its actions would . . . adversely affect the reliability of the regional electric network"; or (2) it "exercised due diligence to prevent the excluded act or practice." *Id.*

4

The WMO Rule also provides an enforcement structure, which allows the Reliability Monitor (in this case Texas RE) to investigate possible ERCOT protocol violations, and provide its findings to PUC staff. *Id*. at § 25.503(k). The PUC staff is given the discretion to initiate an informal fact-finding review to investigate whether a market participant has violated the WMO Rule, including the provision requiring compliance with ERCOT protocols. *Id*. at § 25.503(o). If PUC staff finds that a possible violation exists, it may request that the PUC take appropriate enforcement action against the market participant, and may, among other things, recommend an administrative penalty against the participant. *Id*. at § 25.503(o)(4). The PUC may then initiate a formal enforcement proceeding against the market participant. *Id.* at § 25.503(o). Following a hearing, if a final order is entered against it, the market participant is entitled to judicial review of that order. TEX. UTIL. CODE ANN. §§ 15.001 (West 2016), 15.026 (West 2016).

### The ERCOT Protocol

In the present case, following initial investigations conducted by Texas RE and the PUC staff, the PUC initiated an enforcement action against CPS Energy based on its alleged violation of an ERCOT Protocol relating to ancillary or reserve energy services, which in turn violated subsection (f) of the WMO Rule requiring compliance with all ERCOT protocols. Reserve services are used by ERCOT in various situations, including weather emergencies, in which reserve energy may be needed to balance the grid to ensure that customers in the ERCOT region are provided with sufficient energy on a continuing basis. Market participants, such as CPS Energy, who have become certified to offer reserve energy to ERCOT are known as Qualified Scheduling Entities (QSEs). When the need for reserve energy is predicted, a QSE may offer the use of reserve or standby energy services to ERCOT, including non-spinning reserve services

5

(commonly referred to as NSRS services), which are defined as ancillary services that can be "ramped to a specified output level within 30 minutes," and can operate at a specified output level for at least an hour. In exchange for a fee, a QSE agrees to stand ready to provide NSRS to ERCOT during a specific timeframe, and agrees that it will initiate deployment of NSRS upon receiving a deployment instruction by ERCOT. Once the instruction is given to deploy NSRS, ERCOT Protocol § 6.5.7.6.2.3(4) provides a precise timeline for deployment of the NSRS by a QSE:

- *Within 20 minutes of deployment*, the generator must update the NSRS schedule to indicate the unit's deployment;

- *Within 25 minutes of deployment,* the generator must reach its Low Sustained Limit ["LSL"]; and

- *Within 30 minutes of deployment*, the generator must change the resource status for the generating unit from offline to "on," thus allowing ERCOT to dispatch it.

The ERCOT protocol itself contains one relevant exception, providing that: "Except as otherwise stated in this Section . . . each QSE shall comply fully and promptly with a Dispatch Instruction issued to it, unless in the sole and reasonable judgment of the . . . QSE, such compliance would create an undue threat to safety, undue risk of bodily harm or undue damage to equipment[.]" ERCOT Protocol § 6.5.7.2(1).

**The February 2011 Cold Weather Event**

On January 27, 2011, in anticipation of predicted record cold temperatures in the ERCOT region beginning February 1 and lasting through February 3, ERCOT took steps to address the situation by, among other things, notifying its market participants and QSEs of the impending cold weather event to allow them to take necessary steps to prepare for it. In addition, ERCOT made

6

arrangements with various QSEs, including CPS Energy, to provide reserve NSRS services at a specific time during the cold weather event.  In particular, CPS Energy agreed to provide 96 megawatts of NSRS services by utilizing two of its Braunig Combustion Turbines, the Braunig CT5 and the Braunig CT8, to be available from 4 to 5 a.m. on the morning of February 2, upon receiving a deployment instruction from ERCOT.

At 4:26 a.m., due to unprecedented demands on the grid due to the cold weather event, ERCOT provided instructions to the various QSEs, including CPS Energy, to deploy their NSRS services to ensure the ability to continue providing electricity to its customers in the region.  CPS Energy immediately initiated the start-up sequence of both units two minutes later.  The Braunig CT8 deployed successfully within the 30-minute timeframe required by the ERCOT Protocols.  However, the Braunig CT5 failed to deploy within the required 30-minute timeframe, and instead, was not deployed until 6:09 a.m., approximately one and a half hours after CPS Energy received ERCOT's initial deployment instruction.

CPS Energy's generator was not the only NSRS generator that did not timely deploy that morning, and in fact, over half of the NSRS generators that ERCOT attempted to deploy that morning either failed to deploy or delayed in deploying.  Further, throughout the entire cold weather event, 225 generating units experienced a failure to start during freezing conditions, and at its lowest point, approximately one-third of the total ERCOT generation fleet was unavailable for deployment.  This caused ERCOT to take action to reduce demand on the grid, and led to rolling blackouts that affected 3.2 million customers in the ERCOT area.

### PUC Proceedings

Following the February cold weather event, Texas RE initiated an investigation into

whether CPS Energy had violated ERCOT protocols on the morning of February 2 when the CT5 unit failed to timely deploy. Texas RE initially notified CPS Energy of the possible violation, but when it could not reach an agreement with CPS Energy, it referred the matter to PUC staff.[2] PUC staff thereafter conducted its own informal investigation of the matter, and ultimately initiated a formal enforcement proceeding against CPS Energy for allegedly violating the WMO Rule requiring compliance with the ERCOT protocols, and recommended the imposition of an administrative penalty of $25,000. The matter was then referred to the State Office of Administrative Hearings (SOAH), and a SOAH Administrative Law Judge (ALJ) held a hearing in January 2013.

At the hearing, there was no debate over whether the Braunig CT5 had failed to timely deploy within the time frame set forth in the ERCOT Protocol. However, CPS Energy sought to be excused from compliance based on the various exceptions and excuses set forth in the ERCOT protocols and the WMO Rule. CPS contended that the CT5's failure to deploy was caused by an equipment failure—a non-functioning damper fan—that was unforeseen and beyond its "reasonable control," and that compliance would have posed health, safety, and environmental concerns because deployment of the unit without a functioning damper fan could have caused the unit to explode or emit hazardous particles into the air.

At the hearing, CPS Energy relied primarily on the testimony of two of its employees who explained the events leading up to the CT5's failure to timely deploy on the morning of February 2. Samuel Hernandez, the operations manager for the Braunig Plant site, acknowledged that he had

---

[2] In its report to the PUC, the Texas RE investigator concluded that an ERCOT violation had occurred, but stated that: "Even though the unit did not perform as expected within the required time frame, it is noted that CPS personnel acted quickly and effectively to get the unit started during the difficult and hectic morning while dealing with many other equipment issues. The Braunig CT5 unit is a 48-megawatt unit; therefore, the impact of being late to start-up was minimal to the overall reliability of ERCOT."

received "alerts" from ERCOT before February 1 regarding the cold weather event that was projected to occur, and that CPS Energy's management took steps in advance to prepare the plant for that event. According to Hernandez, CPS Energy had previously prepared the plant for winter, but upon receiving the alerts from ERCOT, it took additional actions to "further reinforce winter preparedness procedures" at the plant in general, and in particular, took steps to recheck the Braunig CT units to ensure their readiness.[3]

Hernandez also testified that in anticipation of the cold weather event, he directed additional staff to be present at the Braunig plant site on the night of February 1 through the early morning hours of February 2. According to Hernandez, a "normal" operating night consists of six operators and one supervisor, but he directed the presence of two additional operators, two additional technicians, and an unspecified number of additional electricians. Hernandez further explained that many of his staff members had already worked "significant hours" to prepare the plant for the cold weather event before February 1, and in order to balance their shifts, he sent home an unspecified number of staff members that day, so they would be available for work the next day, as the cold weather event was anticipated to last at least three days.

Hernandez recalled that due to the extreme cold weather, CPS Energy began having issues with several of its generating units on the night of February 1, at both the Braunig plant site and other sites as well. Hernandez left the Braunig plant site at approximately 10:45 p.m. that night to assist with the "cold start" of other units at a different facility. He was therefore not at the

---

[3] CPS Energy provided evidence establishing that its maintenance of the Braunig units and the steps it took in preparing the units for winter were within industry standards, and neither the ALJ nor the PUC found that CPS Energy was negligent in that regard. The ALJ expressly found that CPS Energy was not at fault in how it maintained the units or in preparing the units for winter weather. Instead, the ALJ found that the sole issue was whether CPS Energy had adequately staffed its plant in preparation for the cold weather event and whether adequate staffing would have enabled CPS Energy to comply with the ERCOT deployment instruction.

Braunig plant site when ERCOT issued its instruction to deploy the two Braunig CT units early the next morning.

The undisputed evidence established that ERCOT provided its instruction to deploy the two Braunig CT generators at 4:26 a.m. on February 2, thereby requiring the units to be online at the LSL level by 4:51 a.m. Although the Braunig CT8 timely deployed, the Braunig CT5 did not. The facts are undisputed that an operator in CPS Energy's control room made three failed attempts to start the CT5 unit as follows:

- 4:28: CPS control room staff initiated start sequence of the CT5.

- 4:39: Start sequence of the CT5 was interrupted.

- 4:41: Start sequence was initiated a second time.

- 4:47: Start sequence was again interrupted.

- 4:49: Start sequence was initiated a third time.

- 5:04: Start sequence was interrupted again.

At approximately 5:01 a.m., the CPS Energy operator spoke with an ERCOT staff member in a recorded conversation, and advised him that the unit was not starting, that it was "tripping offline," and that the unit was indicating a problem with "[l]ow temperature pressures." The ERCOT staff member informed the operator of the urgent need to get the unit online, and advised the operator to "keep firing on it."

At the hearing, various CPS employees explained that the CT5 unit contained an automated computer-based control system built into the unit that was designed and installed by CPS Energy and outside experts to monitor conditions during startup to detect unsafe conditions. They explained that this automated safety system had automatically shut down the start sequence

10

because it had detected an unsafe condition. CPS Energy contended that absent the assistance of a technician who could troubleshoot or investigate the cause of the failure, its operator in the control room had no choice but to keep trying to start the unit. According to Hernandez, there were no technicians available to troubleshoot the problem with the CT5 at the time because the other two technicians who were onsite at the time had been assigned to address problems with the other larger generating units at the plant site. Hernandez further explained that CPS Energy decided to have the two technicians focus on the larger units at the plant site since the larger units were capable of providing more needed electricity to the grid than the Braunig CT5.

Hernandez recalled that he was contacted by a senior plant manager at the Braunig plant site at approximately 4:30 a.m. on February 2, requesting that he return to the plant site to address the various problems occurring at the plant, shortly after ERCOT gave its instructions to deploy the Braunig CT units but before the startup failure occurred. The record reflects that it took Hernandez approximately one hour to reach the Braunig plant site after receiving the call, and he reported to the control room at approximately 5:30 a.m. Upon arrival, he was told that there were problems with the CT5 unit and at least three other units at the plant site. Hernandez immediately directed the control room operator to locate an Instrument and Controls ("I&C") technician to assist in troubleshooting the failed start-up of the CT5 unit.

The I&C technician who ultimately assisted in troubleshooting the problem with the CT5 was William L. Warnke, who had been called to come to the plant site at approximately 4 a.m. Warnke arrived at the plant site at approximately 5:25 a.m. and reported to the control room where he was informed about the problem with the CT5. After discussing the problem with the other two onsite technicians, Warnke physically went to the unit itself to investigate the problem at

11

approximately 5:46 a.m., and found that a tempering air fan discharge damper and its "associated linkage" were frozen and would not move. Warnke was able to break away some of the ice from the unit with a large wrench, allowing the damper to open. Shortly thereafter, the start sequence was initiated for a fourth time, and by 6:09 a.m. the CT5 was online generating electricity.

Warnke explained that it would have been impossible for the unit to operate with a frozen discharge damper because the damper is necessary for the unit's tempering air fans to operate; in turn, the fans are essential to the unit's operation because they regulate the temperature control for the catalyst in the turbine exhaust duct. Warnke further explained that the built-in safety system in the unit is designed to automatically terminate the start-up process if an air fan discharge damper fails to open, and acknowledged that the control room operator had received an "alarm" signaling that a tempering air fan discharge damper had failed to open, thereby alerting him of the particular problem. Warnke testified that several negative outcomes could have occurred if the unit had been operated without the tempering air fans, including explosions, equipment damage, and air pollution emissions.

At the hearing, both Warnke and Hernandez expressed their opinions that the unit's failure to start on the morning of February 2 was unforeseeable, asserting that CPS Energy had no reason to anticipate that there were be a damper failure of this nature. According to Hernandez, during his 33 years of plant operation experience, he had never seen a similar damper failure occur due to freezing weather. Warnke testified that "not once in CPS history has a damper of that type linkage froze over and caused issues with the damper opening."

Both Hernandez and Warnke testified that although the Braunig CT units were only designed to operate at 20 degrees and above, the damper fans themselves were rated at zero

12

degrees and were therefore designed to open regardless of the temperature.[4]  Warnke did acknowledge, however, that "[t]he weather forecast is an important consideration for all units," and that the "ambient temperature surrounding the unit" is a factor to consider in ensuring the reliability of plant operations.

In response to CPS Energy's arguments regarding the foreseeability of the equipment failure, the PUC did not focus simply on whether it was foreseeable for the damper to freeze over and fail to open.  Instead, the PUC focused on the more general question whether it was foreseeable that the Braunig plant site would experience start-up failures due to the anticipated cold weather event, and in turn, whether CPS Energy should have taken steps to ensure that it had adequate staff at the plant to address those potential issues.  In particular, the PUC presented the testimony of Greg D. Graham, a Senior Protocol Compliance Analyst with Texas RE, who was responsible for investigating CPS's violation of the ERCOT protocol.  In his testimony, Graham focused on the fact that CPS Energy had several days' advance notice of the severe cold weather event, and was therefore on notice that it could experience potential problems with all of its generators, including the Braunig CT units.  Graham also pointed out that the Braunig CT units had just been declared commercial in December 2010, and had not been operated in cold weather, therefore rendering the units essentially untested.  Graham further pointed out that the weather forecast was projecting temperatures below the "design criteria" for the Braunig units for the morning of February 2.  In light of this forecast, Graham expressed his disagreement with CPS Energy's conclusion that it could not have anticipated that its equipment might freeze, or that it

---

[4] After the February 2011 event, CPS Energy fabricated covers to place on the dampers.  The ALJ found that CPS Energy had adequately prepared the plant for cold weather operations in accordance with industry standards, and therefore did not consider the lack of covers in determining whether CPS Energy should be excused for the ERCOT violation.

13

could not have anticipated that it might experience other start-up failures at the plant.

Given the known potential for such problems, Graham posited that CPS Energy should have had more staff on hand for the cold weather event, and in particular, more technicians to troubleshoot and investigate the start-up problems CPS Energy encountered on both February 1 and 2. Graham found it significant that CPS Energy's problems with the cold weather at the plant site surfaced as early as 10:55 p.m. on the night of February 1, when multiple generators failed to startup due to the cold weather. Graham opined that because CPS Energy had already assigned its only two technicians at the plant site to work on those failed generators, CPS Energy was on notice that it needed additional staff to address potential problems that might occur with the Braunig CT units when they would be needed the next morning. Graham pointed out that the entire plant site began failing hours before ERCOT gave its instruction to deploy the Braunig CT units, and he therefore believed that there was still time for CPS Energy to call in additional staff to remedy the situation at that time, but that CPS Energy failed to call for any additional help until hours later, when it was essentially too late.

Graham particularly faulted Hernandez, noting that when he left the Braunig plant site at 10:45 p.m. on February 1 to address the start-up problems at another plant site, he was already aware that the Braunig plant site was having significant issues and that both technicians at the site were busy addressing problems with other generators. Graham therefore believed that Hernandez, knowing he had no other available technicians at the plant site to address potential problems with the Braunig CT units, could have avoided the ERCOT protocol violation by reevaluating his staffing plan at that point and calling in additional personnel to ensure that the CT units successfully deployed.

14

Graham further emphasized that during the first three failed attempts to start the Braunig CT5, which began at 4:28 a.m., CPS Energy admittedly had no technicians available to investigate the problem, and took no action to address the issue until almost an hour and a half later when Hernandez and Warnke arrived on the scene. Graham believed the ERCOT violation could have been avoided if CPS Energy had taken steps to ensure that it had sufficient staff on hand to either inspect the CT units before the ERCOT instruction t deploy was given, or at least to enable CPS Energy staff to take reasonable steps to investigate the startup failure immediately after it occurred. Graham further opined that the need for additional staff was illustrated by the fact that CPS Energy "significantly increased" its staff the next day after the failure to deploy occurred.

Graham concluded that it was CPS Energy's choice to offer the reserve energy to PUC on the morning in question, knowing the weather conditions at hand, and that it was therefore CPS Energy's responsibility to adequately prepare to ensure that it met its obligation, knowing it would be subject to administrative penalties if it did not. In his opinion, that responsibility extended not only to ensuring that the units were mechanically sound, but also to ensuring that adequate staff was on hand to make certain the units deployed in a timely manner.

At the hearing, the PUC also presented the testimony of Ernest Garcia, the PUC staff member who investigated CPS Energy's alleged protocol violation. Garcia testified that when he recommended that the PUC initiate enforcement proceedings against CPS Energy, his focus was also on CPS Energy's failure to adequately staff the Braunig plant site in anticipation of the cold weather event, which he viewed as the ultimate cause of the ERCOT violation. Garcia noted that it was within CPS Energy's control to have a technician available to address potential start up issues with its units, and he concluded that if the plant had been adequately staffed in anticipation

15

of the cold weather event, "we would not be here today." Garcia further explained that he considered CPS Energy's violation serious, and he therefore recommended the maximum penalty, in part to deter future violations of the ERCOT protocol.

In rebuttal, both Hernandez and Warnke denied that the staffing levels had any effect on the equipment failure. Hernandez testified that they did have additional staff on site the morning of the incident, which he believed was sufficient under the circumstances known to CPS Energy at the time. Warnke also opined that having even more staff on site would not have helped CPS Energy avoid the ERCOT protocol violation. In particular, Warnke explained that the Braunig CT units typically take 20 minutes to reach LSL levels, and in his opinion, even if a technician had been standing at the unit at the time of start-up, it would have been virtually impossible for the technician to have investigated, diagnosed, and repaired the unit after it first tripped and to have the unit restarted within the required 25-minute period of time.

Warnke also explained that, as part of its increased staffing, CPS Energy had three operators at the plant site during the cold weather event who were specifically assigned to make hourly rounds of the plant, checking heat-tracing insulation, enclosures, portable heaters, heat lamps, and "anything that's out there to prevent freezing." However, he also acknowledged that when making their rounds, these operators would not have inspected the damper fans, because they were considered mechanical items not likely to freeze, and because they were located between two motors in an area that operators would not normally inspect. He therefore concluded that having additional operators at the plant would not have changed the outcome.

CPS Energy also presented the testimony of an industry expert witness, John Allen Moore. Moore acknowledged that plant operations may be affected by severe cold weather, and that

16

staffing is a factor that a market participant should take into consideration in ensuring reliable plant operations when faced with a severe weather event, such as the event in February 2011. He therefore acknowledged that in light of the warnings it had received regarding the anticipated cold weather event, CPS Energy was obligated to provide "additional preparation and staffing to ensure or to help ensure as reliable operations as possible . . . [a]s reasonably possible." Moore expressed his opinion, however, that CPS Energy did in fact take adequate "supplemental steps," by having additional operators and technicians available at the plant to monitor operations and address conditions as they arose during the cold weather event. In Moore's opinion, CPS Energy reacted to the CT5's failure to deploy in an "efficient and responsible manner" in light of the conditions that were occurring at the plant site at the time.

**The Ruling**

Following the SOAH hearing, the ALJ issued its Proposal for Decision. The ALJ found that CPS Energy had violated the ERCOT Protocol when the CT5 unit admittedly failed to deploy within the timeframe required by the Protocol. The ALJ further concluded that CPS Energy had failed to establish an excuse under the WMO Rule. In particular, the ALJ concluded that CPS Energy had failed to establish that its non-compliance resulted from any health, safety, or environmental concerns. The ALJ also concluded that CPS Energy was not excused based on the exception in the WMO Rule for "equipment failure beyond the reasonable control of the market participant." In making that determination, the ALJ agreed with CPS Energy that it was not negligent in its efforts to protect its equipment during the cold weather event, and that its actions in maintaining and winterizing its equipment were "in alignment with industry standards." Instead, the ALJ believed that the sole issue in determining whether the equipment failure was beyond its

17

reasonable control was "whether CPS provided adequate staffing in light of the severe weather and the effect it might have on the relatively new plant." The ALJ noted that CPS Energy had presented evidence that it had provided additional staffing the morning of the equipment failure, but had failed to "establish a benchmark against which to judge its actions." The ALJ believed that without an independent benchmark, it was "impossible to say that the staffing levels employed by CPS were reasonable or prudent." Noting that CPS Energy had the burden to establish a valid excuse, and therefore to present evidence on that issue, the ALJ concluded that CPS Energy had failed to meet its burden of proving "that the failure to comply with ERCOT Protocols was beyond its reasonable control."

The ALJ then addressed the serious nature of CPS Energy's violation in failing to provide the NSRS service in a timely manner as promised to ERCOT, noting that "NSRS is an important tool that ERCOT uses to ensure the reliability of the ERCOT grid." The ALJ also noted that CPS Energy had obligated itself to provide NSRS electricity during what was essentially an emergency situation, and that failing to take reasonable steps to meet its obligations was a "grave violation warranting the maximum penalty available to the Commission." The ALJ further concluded that, "CPS's failure to provide the NSRS it obligated itself to provide on February 2, 2011, contributed to the deterioration of the Grid on that morning, which ultimately led to ERCOT shedding load (i.e., ordering rolling blackouts) to avoid a total system collapse." In recommending the maximum penalty, the ALJ factored in the "deterrent effect" the penalty would have to encourage other market participants to avoid engaging in similar conduct in the future.

The PUC subsequently adopted the findings and conclusions of the ALJ. In its final order, the PUC found that CPS Energy had violated two ERCOT protocols:

18

1) ERCOT Protocol 6.5.7.6.2.3(4), for CPS Energy's failure to have the CT5 generator dispatching electricity within 30 minutes of ERCOT's dispatch (or deployment) instructions.

2) ERCOT Protocol 8.1.1.4.3(3)(b) for CPS Energy's failure to provide a specific resource status to ERCOT within 25 minutes of ERCOT's deployment instructions.

In its final order, the PUC concluded that CPS Energy bore the "burden of proving by a preponderance of the evidence that it should be excused from compliance with ERCOT dispatch instructions and protocol requirements," and that CPS Energy had not met its burden to establish an excuse under the ERCOT protocols or the WMO rule. The PUC then concluded that CPS Energy had not met its burden of establishing any excuse under the ERCOT protocols or the WMO Rule. In doing so, the PUC's order also focused on staffing issues. In particular, the PUC concluded that CPS Energy failed to prove that it had provided adequate staffing at the Braunig site in "light of its choice to offer NSRS from unproven units" during the cold weather emergency. It further concluded that CPS Energy had several opportunities on the morning in question to call in additional staffing "to ensure any start-up failures could be promptly addressed," but failed to take any such necessary action.

Agreeing with the ALJ that the ERCOT protocol violations were serious, particularly because they occurred in the midst of an emergency situation, the PUC ordered CPS Energy to pay the maximum $25,000 administrative penalty for the violations. As permitted by statute, CPS Energy sought judicial review in the Travis County district court in September 2013. *See* TEX. UTIL. CODE ANN. § 15.001 (West 2016). The trial court affirmed the PUC's final order, and this appeal followed.

## DISCUSSION

On appeal, CPS Energy raises several challenges to the PUC's final order. In particular,

19

CPS Energy claims the PUC misinterpreted or misapplied the WMO Rule in a manner that conflicted with a prior decision of the Austin Court of Appeals; that it formulated a new or novel interpretation of the WMO Rule and applied that new interpretation during the enforcement proceeding without giving CPS Energy "fair notice" of the interpretation; that the PUC applied the WMO Rule in a manner that was unreasonable, arbitrary, and capricious; and that the PUC's order was not supported by substantial evidence.

**Standard of Review**

In their challenges to the PUC's final order, CPS Energy has raised a variety of issues, which we review under different standards of review. As a general matter, an appellate court must review the PUC's final order under the "substantial evidence rule," which requires us to give "significant deference to the agency in its field of expertise." TEX. UTIL. CODE ANN. § 15.001 ("Any party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule."); *see also CenterPoint Energy Houston Elec., LLC v. Pub. Util. Comm'n of Texas,* 408 S.W.3d 910, 916 (Tex.App. – Austin 2013, pet denied) (we review a Commission order under the Administrative Procedure Act's (APA) "substantial-evidence" standard); *City of El Paso v. Pub. Util. Comm'n of Texas,* 344 S.W.3d 609, 618 (Tex.App. – Austin 2011, no pet.); *State v. Pub. Util. Comm'n of Texas,* 246 S.W.3d 324, 331 (Tex.App. – Austin 2008, pet. denied).

In conducting our review, we may not substitute our judgment for that of the agency on matters committed to agency discretion. TEX. GOV'T CODE ANN. § 2001.174 (West 2016); *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.,* 36 S.W.3d 597, 602 (Tex.App. – Austin 2000, pet. denied). Further, we must "presume that the agency's order is valid and that its findings,

inferences, conclusions, and decisions are supported by substantial evidence," and therefore, the party challenging the agency's order has the burden to overcome this presumption. *State,* 246 S.W.3d at 331-32 (citing *City of El Paso v. Public Util. Comm'n,* 883 S.W.2d 179, 185 (Tex.1994)).

Our review under the substantial evidence rule is limited to determining whether the "record demonstrates some reasonable basis for the agency's action." *Id.* at 332. If "reasonable minds" could have reached the same decision, we will affirm the agency's decision. We will reverse the agency's decision only if it is "not reasonably supported by substantial evidence, in violation of a constitutional or statutory provision, in excess of the agency's statutory authority, made through unlawful procedure, affected by other error of law, arbitrary or capricious, or characterized by an abuse of discretion." *Id.* (citing TEX. GOV'T CODE ANN. § 2001.174(2)(A)-(F)).

Although we are required to defer to the agency's findings of fact when reviewing an agency order, if an issue on appeal involves a question of law, we review that issue de novo. *Tex. Dep't of Pub. Safety v. Allocca*, 301 S.W.3d 364, 367 (Tex.App. – Austin 2009, pet. denied). In particular, when an issue turns on the construction of a statute or administrative rule, that issue is considered a question of law requiring de novo review. *State,* 246 S.W.3d at 332; *see also First Am. Title Ins. Co. v. Combs,* 258 S.W.3d 627, 631 (Tex. 2008); *CenterPoint Energy Houston Elec., LLC*, 408 S.W.3d at 916 (when a dispute centers on the agency's interpretation of its rules, questions of rule construction are reviewed de novo).

In general, a reviewing court must construe administrative rules, which have the same force as statutes, in the same manner as statutes. *CenterPoint Energy Houston Elec., LLC*, 408 S.W.3d at 916 ("We interpret administrative rules, like statutes, under traditional principles of

21

statutory construction."). When an administrative rule or statute is unambiguous, it must be interpreted based on its plain language, unless that interpretation would produce an absurd result. *Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 254 (Tex. 1999); *see also CenterPoint Energy Houston Elec., LLC,* 408 S.W.3d at 916-17; *Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 284 (Tex. 1999); *State,* 246 S.W.3d at 332. If an agency has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. *Rodriguez*, 997 S.W.2d at 255; *see also CenterPoint Energy Houston Elec., LLC.,* 408 S.W.3d at 916-17; *Pub. Util. Comm'n v. Constellation Energy Commodities Grp., Inc.*, 351 S.W.3d 588, 595 (Tex.App. – Austin 2011, pet. denied).

However, if the rule is ambiguous or leaves room for policy determinations, we defer to the agency's interpretation if the interpretation is reasonable, but not if the agency's interpretation is plainly erroneous or inconsistent with the regulation or its underlying statutes. *CenterPoint Energy Houston Elec., LLC,* 408 S.W.3d at 916-17 (*citing Rodriguez*, 997 S.W.2d at 254–55); *see also City of El Paso v. Pub. Util. Comm'n of Texas,* 344 S.W.3d at 618-19; *Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 624–25 (Tex. 2011) (although we must give "serious consideration" to a governmental agency's construction of a statute it is charged with administering, this principle presupposes that the statute is ambiguous and the agency's construction is reasonable and does not conflict with the statute's language). Further, courts "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise, or deal with a nontechnical question of law." *State*, 246 S.W.3d at 332-33 (citing *Rylander v. Fisher Controls Int'l, Inc.,* 45 S.W.3d 291, 302 (Tex.App. – Austin 2001, no pet.)).

**ANALYSIS**

**Issue One:** **Whether the PUC's Interpretation and Application of the WMO Rule Violated CPS Energy's Due Process Right to Fair Notice**

CPS Energy contends that prior to the current enforcement proceeding, the WMO Rule had been interpreted by the Austin Court of Appeals in *TXU Generation* to mean that a market participant could not be held liable for actions resulting from "unforeseen" accidents or mechanical failures. CPS Energy believes that the Austin Court gave "assurances" to market participants that they would not be subject to liability for any such unforeseen events. CPS Energy contends that in the current proceeding, the PUC interpreted and applied the WMO Rule in a new and novel manner, which conflicted with *TXU Generation*. In particular, it argues that, without any notice of this interpretation, the PUC initiated enforcement proceedings against it for what CPS Energy believes was an unforeseeable mechanical failure on the morning of February 2, 2011. CPS Energy argues that a regulatory agency is forbidden from giving a new interpretation of a rule for the "first time in an enforcement proceeding," and that by doing so in this proceeding, the PUC deprived CPS Energy of any "meaningful, prehearing notice," which undermined the fundamental fairness of the proceeding.

We agree with CPS Energy that a regulated party must be given "fair notice" of what type of conduct will subject it to an enforcement proceeding, and the regulated party must not be forced to guess what type of conduct will subject it to an enforcement proceeding or be clairvoyant in attempting to divine the agency's interpretation of the rule in advance. *Vista Healthcare, Inc. v. Tex. Mut. Ins. Co.*, 324 S.W.3d 264, 273 (Tex.App. − Austin 2010, pet. denied); *see also Christopher v. SmithKline Beecham Corp.*, __U.S. __, 132 S.Ct. 2156, 2168, 183 L.Ed.2d 153 (2012) (it is improper for a regulatory agency to interpret and apply a rule in a novel manner for the

23

first time in an enforcement proceeding). However, as explained below, we disagree with CPS Energy that it was not on notice that its conduct on the morning of February 2 could subject it to liability. We further conclude the PUC interpreted the WMO Rule in a manner that was consistent with *TXU Generation* and with the plain language of the Rule itself.

### *TXU Generation*

In *TXU Generation,* the parties brought a facial challenge to the constitutionality of subsection (g) of the WMO Rule, which provides that market participants are subject to enforcement actions if they engage in "[a]ny act or practice of a market participant that materially and adversely affects the reliability of the regional electric network or the proper accounting for the production and delivery of electricity among market participants[.]" 16 TEX. ADMIN. CODE § 25.503(g). Subsection (g) of the WMO Rule contains a list of seven "prohibited activities," all of which are aimed at preventing unfair trade practices within a power region. The market participants in *TXU Generation* claimed the WMO Rule was unconstitutionally vague on its face, and failed to give market participants fair notice of what type of conduct could subject them to an enforcement proceeding. Among other things, the market participants were concerned about the seventh prohibited activity in subsection (g), which provides that a "[a] market participant shall not engage in market power abuse." *See id.* at § 25.503(g)(7). The market participants noted that the Rule did not contain a precise definition of what actions would constitute a "market power abuse."[5]

---

[5] The market participants also contended that the WMO Rule was invalid because it lacked an "intent" element, and would allow a market participant to be found liable for a "market power abuse" even if their actions were unintentional acts. The market participants argued that the Commission lacked the statutory authority to prohibit unintentional conduct, and argued that at the least, the Court should imply an "element of intent" into the Rule. *TXU Generation*, 165 S.W.3d at 832-34. The Austin Court disagreed, noting that the PUC enacted the WMO Rule to protect consumers and to ensure a reliable electricity network – a task that the Legislature expressly gave to the PUC. *Id.* at 834. The Court concluded that the "WMO Rule reflects the Commission's decision, based on its expertise, that both

24

The market participants claimed the WMO Rule was unconstitutionally vague because subsection (g) did not clearly define the type of activities that would be considered a "market power abuse," claiming that the language in the Rule was too "open-ended," was "confusing," created "unknown risks," and generally did not provide enough specificity to allow market participants to take measures to avoid violations. *TXU Generation Co., L.P.*, 165 S.W.3d at 838-40. As one example of their confusion, the market participants questioned whether they could be found liable for a "market abuse" under subsection (g)(7) of the Rule for "withholding" electricity in situations in which their failure to delivery electricity was due to "accidents or ordinary mechanical breakdowns," such as "mechanical failures and computer glitches," pointing out that such events could have an adverse effect on the electricity market through no fault of the market participants. *Id.* at 839-40.

In addressing that concern, the Austin Court was unable to point to any provision in subsection (g) of the WMO Rule that would excuse the market participants from liability under those circumstances. However, the Court concluded that subsection (g) should not be read "in isolation," and that it should instead be interpreted in conjunction with subsection (h) of the WMO Rule, which sets forth various affirmative defenses to a violation of subsection (g). *Id.* at 840. In particular, subsection (h) expressly provides a market participant with two affirmative defenses to a claim of market power abuse if the market participant establishes that its conduct: (1) "served a legitimate business purpose consistent with prices set by competitive market forces; and that it did not know, and could not reasonably anticipate, that its actions would inflate prices, adversely

intentional and unintentional actions in the wholesale market that adversely affect reliability must be prohibited in order to prevent market power abuse, ensure retail customers 'safe, reliable, and reasonably priced electricity,' and ensure reasonably priced electric power for ancillary services." *Id.* The Court therefore expressly concluded that the Commission was entitled to bring enforcement actions for both intentional and unintentional conduct. *Id.*

25

affect the reliability of the regional electric network"; and (2) "if applicable, that it exercised due diligence to prevent the excluded act or practice."[6]   16 TEX. ADMIN. CODE § 25.503(h).

Paraphrasing subsection (h) as providing a defense when the "adverse effect on reliability, price, or accounting was not known or foreseeable with the exercise of due diligence," the Austin Court opined that this "provision gives clear notice that the unforeseen accidents described by TXU will not give rise to liability under the [WMO] rule."[7]  *TXU Generation Co. L.P.,* 165 S.W.3d at 840.   In concluding that the WMO Rule thereby gives participants notice of what type of conduct will give rise to liability, the Court concluded that the "rule does not require clairvoyance as to whether an action will impact price, reliability, or accounting – only diligence." *Id.* at 840.

Although we agree with CPS Energy that important lessons can be derived from *TXU Generation*, we also note that clear distinctions may be drawn between the issues posed in *TXU Generation* and the questions before this Court.   First, *TXU Generation* was focused on the facial constitutionality of subsection (g) involving market power abuses, and whether the language used in that section was unconstitutionally vague and failed to give market participants clear notice of what type of conduct would cause a violation of subsection (g).

In the present case, however, CPS Energy was not charged with a violation of subsection (g), and was instead found to have violated subsection (f).   Subsection (f) clearly and in plain

---

[6] As discussed in more detail below, subsection (h) expressly provides that these affirmative defenses can also be applicable to subsection (f) violations for failures to comply with ERCOT protocols.   16 TEX. ADMIN. CODE § 25.503(h).

[7] The Court also noted that the ERCOT protocols address "issues such as scheduled maintenance and the shutdown of plants," which clearly give market participants guidance on what type of activities are considered prohibited.   *Id.* at 840 n.10.   The Court noted that if an "action is authorized by ERCOT under its protocols, it is not a prohibited activity." *Id.*

language informs a market participant that it must "comply with ERCOT procedures and any official interpretation of the Protocols issued by ERCOT or the commission." 16 TEX. ADMIN. CODE § 25.503(f). There is no ambiguity in subsection (f), and significantly, we note that CPS Energy does not contend that it was unaware of the ERCOT protocols it was found to have violated, or that it did not have notice of what type of conduct would cause it to be in violation of those protocols. In fact, CPS Energy acknowledges that it was aware that the ERCOT protocols set forth a specific timeline for having NSRS services deployed, and that it failed to comply with that timeline.

What is at issue in this case is whether CPS Energy was on notice of what type of situations would cause it to be *excused* from that duty. There are two separate provisions in the WMO Rule on which CPS Energy could have relied in seeking to excuse its performance. First, the WMO Rule contains the two affirmative defenses set forth in subsection (h), which were specifically addressed in the *TXU Generation* opinion, and which may excuse a market participant's violation if it can demonstrate that it used "due diligence" to avoid the violation. 16 TEX. ADMIN. CODE § 25.503(h). Second, the WMO Rule contains the specific excuse provisions within subsection (f) itself, which provide excuses for "equipment failure beyond the reasonable control of the market participant[,]" and the various excuses based on health, safety, and environmental concerns. *Id.* at § 25.503(f).

In its brief, however, CPS Energy makes no mention of the affirmative defense provision found in subsection (h) of the WMO Rule, and instead focuses exclusively on whether it was entitled to rely on the excuse provisions found in subsection (f) of the Rule. Although *TXU Generation* focused exclusively on the affirmative defenses set forth in subsection (h), CPS

27

Energy nevertheless repeatedly attempts to apply the standards set forth in the Austin Court's discussion of subsection (h) to its analysis of the excuse provisions found in subsection (f). As discussed in more detail below, however, the particular excuses set forth in subsection (f) are based on different considerations, and warrant a separate and distinct discussion—one that the Austin Court was not called upon to make in *TXU Generation*. We believe that much of the confusion in this case stems from CPS Energy's apparent failure to recognize the distinction between these two subsections.

Nevertheless, to the extent that *TXU Generation* requires us to consider whether the equipment failure in this case was "foreseeable," which appears to be the primary focus of CPS Energy's argument in its brief, we turn our attention to that issue.

### *Whether CPS Energy could have Reasonably Anticipated its Actions Would Adversely Affect the Electric Network*

CPS Energy argues throughout its brief that it should not be held liable for the equipment failure that occurred on February 2, as it was an "unforeseen" occurrence. In particular, CPS Energy contends that it presented undisputed evidence during the SOAH hearing that its failure to timely deploy the CT5 unit in accordance with the ERCOT protocol was due solely to "unforeseeable equipment failure[.]" CPS Energy points out that the evidence established that the CT5 unit failed to start due to a frozen damper fan, and claims it had no way of anticipating this failure. CPS Energy points out that two of its employees testified that they had never before encountered a frozen damper fan in their years of employment at CPS Energy, and that they had no reason to anticipate that the damper fan would freeze on the morning in question. CPS Energy also finds it significant that the ALJ expressly found that the equipment failure did not occur due to any maintenance issues or due to any failure by CPS Energy to prepare its equipment for the cold

28

weather event. CPS Energy essentially believes that because it was not on notice of any preexisting mechanical issues with the damper fan, the PUC was required to find that the damper fan's failure to open was an unforeseeable occurrence, absolving it of all blame.

We believe, however, that CPS Energy's focus is too narrow, and is in fact contrary to the actual language used in the WMO Rule. The first affirmative defense in subsection (h) of the WMO Rule (which the Austin Court specifically discussed in *TXU Generation*) expressly places the focus not on whether a particular piece of equipment might fail, but on whether the market participant could have "reasonably anticipate[d] that its actions would … adversely affect the reliability of the regional electric network[.]" 16 TEX. ADMIN. CODE § 25.503(h).

The real question then is whether CPS Energy could have "reasonably anticipated" that its "actions" leading up to and during the cold weather event would "adversely affect" the grid on the morning of February 2. In turn, CPS Energy's "actions" leading up to the cold weather event consisted both of preparing the plant's equipment for the event and in making staffing decisions. As set forth above, the PUC had no issue with the actions CPS Energy took in preparing its mechanical equipment for the event, and instead focused exclusively on its actions in staffing its plant. We believe that this was a fair and reasonable focus in light of the language used in subsection (h).

As acknowledged by CPS Energy's own expert witness, staffing decisions are a factor in preparing a plant for cold weather events. CPS Energy's operations manager also recognized this when he made the decision to have additional staff on hand in anticipation of the February cold weather event. Further, the PUC also provided testimony that staffing can affect the reliability of the grid, particularly during severe weather events, as market participants are on notice that they

29

may encounter equipment failures due to cold weather and must therefore consider whether they have sufficient staff on hand to address those failures. Moreover, there was no dispute among the witnesses at the SOAH hearing that CPS Energy could have reasonably anticipated that it would encounter equipment failures, at least of a general nature, as the plant was not rated for the temperatures projected to occur during the event. And finally, and perhaps most importantly, CPS Energy knew that it had promised ERCOT to provide NSRS services during the cold weather event from its two untested Braunig CT units, and it knew that if it did not provide those services as promised, the grid could be adversely affected during what could have been, and in fact ended up being, an emergency situation. Therefore, we conclude that the PUC presented substantial evidence that CPS Energy could have "reasonably anticipated" that its actions in staffing its plant prior to the cold weather event could have adversely affected the grid.

Also, the evidence established that CPS Energy did in fact begin experiencing significant freezing and consequent equipment failures at its plant site the night before it was required to provide the NSRS services to ERCOT, which diverted the attention of its only two technicians at the plant, and as CPS Energy admits, rendered them unavailable to address any issues that might have arisen, and did in fact arise, with the deployment of the CT5 unit. As the PUC noted, this occurred hours before the time CPS Energy had promised to have the CT5 unit ready to deploy, and CPS Energy therefore had sufficient time to take additional actions to ensure that it had a technician available to address potential problems with the CT5, yet it waited several hours before it called in additional staff, and effectively did so at a time when it was too late to avoid the adverse effect of the CT5's failure to deploy.

### Whether CPS Energy Exercised Due Diligence

30

These same factors are relevant in determining whether the second affirmative defense set forth in subsection (h) of the WMO Rule would apply, *i.e.*, whether CPS Energy "exercised due diligence to prevent the excluded act or practice." 16 TEX. ADMIN. CODE § 25.503(h). Thus, in determining whether CPS Energy exercised due diligence to prevent the ERCOT protocol violation, the PUC was entitled to consider not only whether CPS Energy took reasonable steps to prepare its equipment for the cold weather event, but also whether it took reasonable steps to ensure that its plant was adequately staffed for that event. Once again, it is significant to remember that CPS Energy had voluntarily promised to provide NSRS services to ERCOT at a specific time on the morning of February 2, during an extreme cold weather event, and it was therefore incumbent upon CPS Energy to use due diligence to ensure that it would have an adequate staff to meet its obligations, and thereby avoid an ERCOT protocol violation.

In fact, even under normal operating conditions, common sense dictates that market participants, and utility providers in particular, must exercise due diligence in ensuring not only that their equipment is in sound mechanical condition, but that they have adequately staffed their plants to ensure that they are able to comply with the ERCOT protocols so as to avoid WMO Rule violations. Utility providers, such as CPS Energy, are subject on a daily basis to numerous ERCOT protocols that require them to produce electricity at a certain volume, and market participants are aware that they may suffer penalties for overproduction or underproduction at any given time. Under CPS Energy's approach, if a utility provider chose to understaff its plant, knowing that this could possibly lead to a complete or partial shutdown of its facilities, the provider would be able to escape liability for any consequent ERCOT violation by simply arguing that it maintained its equipment in sound condition, without being held accountable for its lack of

31

staffing.

Similarly, there can be no doubt that a QSE in particular must exercise due diligence in not only maintaining its equipment, but also in staffing its plant to ensure that it will be able to produce NSRS services to ERCOT at a time when promised, if it wishes to avoid an ERCOT protocol violation. In this regard, CPS Energy's obligation to ERCOT was not simply to have an operator initiate a startup process when requested by ERCOT. Instead, as discussed in more detail below, its duties were many and continuing in nature. Under the express terms of the ERCOT protocol, CPS Energy was required to initiate startup within a certain timeframe; ensure that its generator reached the LSL level within a certain timeframe; to ensure that its generator started producing electricity within a certain time; and to continue to produce electricity for a certain time. Therefore, CPS Energy was obligated to have sufficient staff on hand throughout this entire process to ensure that it would be able to meet its obligations to ERCOT.

Further, what constitutes an adequate staff on any given occasion will vary depending on the circumstances, and will require the PUC to make a factual determination on a case-by-case basis whether due diligence was exercised. At one extreme, there may be some cases where the lack of due diligence is obvious, and other cases where the adequate exercise of due diligence is unquestioned. In most enforcement cases, however, the facts will not be so clear. In those cases, if the market participant desires to excuse its performance, it will be required to present evidence that it exercised due diligence in an attempt to meet its obligations.

In a case involving normal operating conditions, this standard might be fairly low. However, the present case involved anything but "normal" operating conditions, and CPS Energy was aware days in advance that it would be facing an unprecedented severe weather event that

called for unique and unusual preparations.   As such, we conclude there was substantial evidence from which the PUC could have concluded that, in light of the unique facts of this case, CPS Energy did not adequately staff its plant to ensure that it would be able to meet its obligations to ERCOT.

CPS Energy, however, argues that allowing the PUC to determine whether it had adequate staffing levels at any given time will allow the PUC to "second-guess" a market participant's decision regarding how to staff its plant; will allow the PUC to use "hindsight" in accusing a market participant of not having an adequate staff; and will otherwise require market participants to engage in "clairvoyance" in trying to anticipate what the PUC might deem to be adequate staffing levels on any given occasion.   We disagree, and instead conclude that allowing the PUC to make this type of determination was within its authority.

The Legislature expressly gave the PUC the authority in the WMO Rule to determine whether a market participant's conduct was excused based on a due diligence defense, and therefore gave the PUC the right to consider all relevant factors in making this determination. Further, in order to protect a market participant's rights, the Legislature gave market participants the right to a hearing on this issue, at which the participant is entitled to present evidence whether it exercised due diligence, whether its actions were reasonable, and whether its actions met industry standards.

We note that CPS Energy does not contest the PUC's right in conducting a due diligence analysis to consider whether a market participant was negligent in maintaining its equipment, yet it appears to believe that allowing the PUC to determine whether it had adequate staffing will somehow pose a greater danger that the PUC will act without reference to guiding principles or

33

that it will require market participants to have to guess at what the PUC expects of it. However, we see no distinction between allowing the PUC to make these two types of determinations, nor do we believe that it requires clairvoyance by market participants to know they are required to use diligence not only in maintaining their equipment but also in staffing their plants as well. As the Austin Court recognized, the WMO Rule makes clear what is expected of a market participant, and the "rule does not require clairvoyance as to whether an action will impact price, reliability, or accounting – only diligence." *TXU Generation Co., L.P.,* 165 S.W.3d at 840.

For this same reason, we reject CPS Energy's contention that the PUC's interpretation of the WMO Rule imposed a "strict liability" standard on market participants that allows the PUC to find a violation virtually any time it has a mechanical failure, whether foreseeable or not. Instead, as set forth above, in any given case, the PUC will be guided in its decision-making process by the principles set forth in the WMO Rule, including the affirmative due-diligence defense provisions found in subsection (h) of the Rule, as well as the excuse provisions found in subsection (f) of the Rule, to which we now turn our attention. Issue One is overruled.

### Issue Two: Whether the Equipment Failure was Beyond CPS Energy's Reasonable Control

The primary focus of the parties' argument in the proceedings below, as well as on appeal, is whether CPS Energy was excused from complying with the ERCOT protocol to have its CT5 generator online in a timely manner under subsection (f)(2)(c) of the WMO Rule, which provides, in part, that a market participant may be excused for non-compliance "due to . . . equipment failure beyond the reasonable control of the market participant[.]" 16 TEX. ADMIN. CODE § 25.503(f)(2)(C). In contending that the PUC erred in concluding that it was not excused under this provision, CPS Energy raises two fundamental challenges to the PUC's decision, contending

34

that the PUC erroneously applied the Rule when it adopted an "unreasonable interpretation" of this provision, and that the PUC's decision was not supported by substantial evidence.

### Burden of Proof to Establish an Excuse under the WMO Rule

Initially, we note that the PUC shoulders the initial burden to establish that a market participant has violated a WMO Rule; however, once the PUC has met that initial burden, the WMO Rule, by its plain language, provides that the burden then shifts to the market participant to establish an excuse under subsection (f) of the Rule: "A market participant who does not comply with a Protocol requirement or official interpretation of a requirement, or honor a formal commitment to ERCOT, has the burden to demonstrate, in any commission proceeding in which the failure to comply is raised, why it cannot comply with the Protocol requirement or official interpretation of the requirement, or honor the commitment." 16 TEX. ADMIN. CODE § 25.503(f)(4). Further, we note that the WMO Rule also places the burden of proof on the market participant to establish the affirmative defenses set forth in subsection (h) of the Rule, stating that: "A market entity claiming an exclusion or defense under this subsection, or any other type of affirmative defense, has the burden of proof to establish all of the elements of such exclusion or defense." *Id*. at § 25.503(h).

### The PUC's Application of the WMO Rule

CPS Energy correctly points out that the undisputed evidence established that the ERCOT protocol violation in this case initially resulted from equipment failure, in the form of a frozen damper fan that failed to open during the Braunig CT5's start-up process. CPS Energy contends that it further presented undisputed evidence to establish that the equipment failure was beyond its reasonable control, in accordance with the excuse language set forth in subsection (f)(2)(C) of the

WMO Rule, and that the PUC erred in concluding otherwise.

CPS Energy's initial argument centers on its belief that the PUC did not apply the correct legal standard for determining whether the equipment failure was within CPS Energy's reasonable control, contending that this is an "unambiguous, well-defined, objective" legal standard that requires a court to find both that: (1) the failure itself was caused by the party's own negligence; and (2) that the failure was foreseeable. It contends that the equipment failure in this case was neither caused by its own negligence nor was it foreseeable, and concludes therefore that the PUC applied the WMO Rule in an unreasonable or arbitrary and capricious manner. We disagree with CPS Energy's interpretation of the Rule.

Initially, CPS Energy cites a line of cases for the proposition that one of the primary factors in determining whether an event is beyond a person's reasonable control is whether the party "by its own negligence, affirmatively caused the condition that prevented performance."[8] Most of the cases cited by CPS Energy, however, involve situations in which a court was called upon to interpret a contract containing a "force majeure" clause, which excused the party when its performance was prevented by a force majeure event, *i.e.*, an act that was outside the party's "reasonable control." In most of those cases, the party's own negligence was the cause of its

---

[8] *See, e.g., Sun Operating Ltd. P'ship v. Holt,* 984 S.W.2d 277, 288, n.4 (Tex.App. – Amarillo 1998, pet. denied) (in interpreting "force majeure" clause in party's contract, court held that if a party's delay was due to its negligence, it could not be viewed as resulting from a "circumstance within its reasonable control" and therefore could not be considered a "force majeure event"); *Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427, 435 (Tex.App. – Amarillo 1993, no writ) (party could not invoke the "force majeure clause" in a contract, where it was unable to operate a well in compliance with the terms of a lease because the Texas Railroad Commission shut down its operations after its multiple failures to comply with the Commission's orders, rendering the non-compliance to be within its "reasonable control"); *Moore v. Jet Stream Investments, Ltd.,* 261 S.W.3d 412, 420 (Tex.App. – Texarkana 2008, pet. denied) (lessee who was required to operate an oil and gas lease could not rely on the force majeure clause in the parties' contract, where the Railroad Commission shut down its operations for failure to comply with the Commission's financial assurance regulations). *see also Seamless Floors by Ford, Inc. v. Value Line Homes, Inc.,* 438 S.W.2d 598, 602-03 (Tex.Civ.App. – Fort Worth 1969, writ ref'd n.r.e.) (in interpreting a contract that placed liability on contractor for acts of its own negligence, the court noted that the contractor would only be liable for "negligent acts or omissions which would be within its reasonable control").

36

inability to perform the contract, and therefore, it was held that the party's nonperformance was not caused by a "force majeure event" that was outside the party's reasonable control. *See e.g., Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427, 435 (Tex.App. – Amarillo 1993, no writ) (party could not invoke the "force majeure clause" in a contract, where it was unable to operate a well in compliance with the terms of a lease because the Texas Railroad Commission had shut down its operations after its multiple failures to comply with the Commission's orders, rendering the non-compliance to be within the party's "reasonable control"). CPS Energy is correct that neither the ALJ not the PUC believed that CPS Energy was negligent in causing the initial equipment failure due to any failure on its part in maintaining or preparing the equipment for the cold weather event. As CPS Energy points out, the ALJ expressly found, and the PUC agreed, that CPS Energy had adequately maintained its equipment, that it took all necessary precautions in accordance with industry standards to winterize its equipment, and that it generally took steps to "prevent and troubleshoot equipment failures known to occur in winter weather conditions."

CPS Energy appears to believe that its duties stopped there, and that the PUC was not entitled to take into consideration what steps it took once its Braunig plant began experiencing significant freeze issues and consequent startup failures starting the night of February 1. Yet, it appears that CPS Energy could have taken additional steps at that time to ensure the timely deployment of is Braunig units the next morning. For example, as Graham pointed out in his testimony, CPS Energy could have called in additional staff once these freeze issues began in order to ensure that it had sufficient staff to prevent and address potential startup problems with the Braunig CT units the next morning. Further, CPS Energy overlooks that once the entire Braunig

37

plant began experiencing freeze problems, it could have assigned one of its operators or technicians to inspect the CT units before the anticipated ERCOT instruction to deploy was given, which could have prevented the startup failure in the first place. If an operator or technician had inspected the unit *before* the anticipated ERCOT instruction was given, it is likely that the frozen damper would have been discovered, and the problem could have been easily addressed by knocking the ice off of it as Warnke did hours later, thereby preventing any ERCOT violation. Similarly, CPS Energy could have required its staff to start up the CT units earlier in the morning of February 2, prior to the anticipated ERCOT deployment instruction, to determine if the units were operational, which in turn, would have given staff time to troubleshoot any problems prior to the critical moment when ERCOT gave its deployment instruction. In light of the fact that the entire Braunig plant site, along with CPS Energy's other plant sites in the area, were experiencing significant freeze issues and multiple startup failures hours before the anticipated ERCOT deployment instruction was given, it would not have been unreasonable for the PUC to conclude that CPS Energy was required to have adequate staff on hand to ensure a timely deployment and to avoid startup failures at the critical time when NSRS energy was needed to balance the grid.

Moreover, CPS Energy also asks us to overlook the duties that it owed to ERCOT *after* the startup failure occurred, and it appears to believe that the issue of whether it had adequate staff on hand to repair the equipment *after* it failed was irrelevant to the question of whether an ERCOT protocol violation occurred. In particular, CPS Energy contends that there is "no statute, rule, protocol, or standard regarding the efforts that a market participant must make and resources that must be available to repair an equipment failure once it has occurred." We disagree.

It is important to recognize the continuing nature of CPS Energy's duties on the morning of

38

February 2, 2011. CPS Energy pledged to stand ready to provide NSRS services to ERCOT upon its instruction from 4 to 5 a.m. that morning. It further pledged to have the NSRS services available to ERCOT within 30 minutes of its deployment instructions. And, most importantly, it pledged to provide the NSRS services to ERCOT for an hour after deployment.

Although CPS Energy may have been entitled to an excuse for compliance with the ERCOT protocol timelines when the equipment failure *initially* occurred, the language in subsection (f) clearly states that the excuse does not last forever. Instead, it states that a "market participant is excused under this subparagraph only for so long as the condition continues." 16 TEX. ADMIN. CODE § 25.503(f)(2)(C). This raises two possibilities: (1) that the excuse continues for as long as the "equipment failure" lasts; or (2) the excuse continues for as long as the "equipment failure beyond the reasonable control of the market participant[.]" We believe that the latter possibility is the only reasonable interpretation of this provision. By its very terms, the "condition" that provides the excuse in the WMO Rule is not "equipment failure" standing alone, but is instead "equipment failure beyond the reasonable control of the market participant[.]" *Id*. Any contrary interpretation would lead to the untenable position of allowing a market participant to simply throw up its hands and absolve itself of any blame once an initial equipment failure occurs, with no requirement that it make reasonable efforts to address the failure. Given the Legislature's recognition of the crucial importance of keeping the grid in balance and electricity flowing to customers in a reliable manner, we cannot conclude this would be the Rule's intent. We therefore conclude that CPS Energy was allowed to rely on the equipment failure as an excuse for its performance under subsection (f) only for as long is the equipment failure was "beyond its reasonable control."

39

In turn, we conclude that the PUC was allowed to make the factual determination of precisely when the equipment failure was no longer beyond CPS Energy's "reasonable control," and what steps CPS Energy was required to take to address that failure at that point in time. The question of whether CPS Energy adequately staffed its plant to be able to address the equipment failure *after* it initially occurred was a pivotal issue in the PUC's analysis. And, whether CPS Energy had adequate staff on hand to address the failure once it occurred was clearly a factor within CPS Energy's "reasonable control."

### *The "Foreseeability" Factor*

CPS Energy, however, argues that we should include a "foreseeability" analysis in determining whether the equipment failure was "beyond its reasonable control." In particular, CPS Energy contends that it was unreasonable for the PUC to determine that it did not properly staff its plant in anticipation of an "unforeseeable" event, such as the frozen damper fan, which occurred on the morning of February 2. According to CPS Energy, it was unreasonable and illogical for the PUC to conclude that it had any reasonable control over an unforeseeable event of this nature, and that it should have staffed its plant in advance based on an event that had not even occurred. Once again, CPS Energy contends that the PUC's decision, if allowed to stand, will give the PUC the authority to second guess staffing decisions after the fact, and force market participants to engage in "clairvoyance" in trying to anticipate staffing needs in advance of virtually all unforeseeable and unanticipated events. According to CPS Energy, this will require market participants to adhere to an unobtainable standard of perfection and will essentially render all of the excuses set forth in subsection (f) meaningless. CPS Energy therefore contends that the PUC's interpretation of the WMO Rule was not only unreasonable, but arbitrary and capricious,

40

and made without reference to any guiding principles.

We disagree with CPS Energy's "foreseeability" analysis for the same reasons we disagreed with its argument that it could not have reasonably anticipated that its actions in failing to adequately staff its plant would adversely affect the ERCOT electric network. As set forth above, the evidence presented at the SOAH hearing indicated that the February cold weather event was highly anticipated for days in advance. Further, all witnesses agreed that it was foreseeable that the cold weather event could lead to equipment failures at the Braunig plant site, and that adequate staffing was therefore needed to prevent and address those possible failures. And, more importantly, CPS Energy knew that it had a continuing duty to take all reasonable steps to ensure that the Braunig CT5 was ready to deploy on the morning of February 2, which included the duty not only to ensure that the unit was mechanically sound, but also to ensure that it had adequate staff to make certain that it would start up properly and continue running for the required period of time.

As CPS Energy does not deny that staffing its plant at an adequate level was a factor within its reasonable control, we believe that the PUC properly considered this factor in determining whether the equipment failure—the CT5's failure to deploy the morning of February 2—was beyond CPS Energy's reasonable control under the excuse provisions of subsection (f).

### The PUC's Decision was based on Substantial Evidence

As set forth above, the PUC's decision that CPS Energy was not excused from compliance with the ERCOT protocol under subsection (f) was based on two factors: (1) CPS Energy failed to carry its burden to prove that it provided "adequate staffing" at the Braunig plant site on the morning of February 2, in "light of its choice to offer NSRS from unproven units;" and (2) CPS Energy had several opportunities on the morning in question to "call in additional staffing . . . to

41

ensure any start-up failures could be promptly addressed" but failed to do so.

In contending that this conclusion was not supported by substantial evidence, CPS Energy points out that it did in fact provide additional staffing at the plant, adding six additional operators and two technicians, which, at the time, it believed was sufficient to address any foreseeable problems the plant might encounter. CPS Energy further contends that the record is barren of any evidence demonstrating that this was not an "adequate" staffing level, and that the PUC failed to present any evidence to demonstrate that having more staff members on hand would have avoided the ERCOT violation.

The PUC did not have the burden of proof on this point, however. Instead, it was CPS Energy's burden to establish an excuse and demonstrate that it took all reasonable steps within its control to avoid the ERCOT violation, and in particular to adequately staff its plant to ensure that the CT5 would operate as required. As the ALJ found, CPS Energy failed to meet this burden of proof because it failed to present any evidence to establish that it staffed its plant in accordance with industry standards during the cold weather event. Further, the PUC was entitled to rely on the testimony of the PUC's witness, Greg Graham, who expressed his opinion that, in light of the potential for problems that could have occurred during the cold weather event and did in fact occur on the morning when CPS Energy had promised to provide NSRS services to ERCOT, CPS Energy should have had more staff available to troubleshoot and investigate start-up problems CPS Energy encountered on both February 1 and 2. Further, as Graham also pointed out, when the entire plant site started to encounter significant problems hours before it was required to deploy the Braunig CT5, CPS Energy knew that its two available technicians were assigned to other tasks, and that if problems occurred with the CT5, there would be no technicians to assist with the CT5's

42

deployment.

Further, regardless of the adequacy of its staffing levels, the record raises a significant question whether CPS Energy took all of the steps that were within its "reasonable control" to prevent the startup failure in the first instance, and to address that failure in a timely manner after it occurred. As set forth above, it is not unreasonable to conclude that CPS Energy should have required one of its employees to inspect or test the CT units before the anticipated ERCOT instruction was given, particularly in light of the significant freeze issues that had been occurring several hours beforehand and in light of its knowledge that it would be required to provide NSRS power to ERCOT at a specific time the morning of February 2. Taking such actions could have detected the frozen damper fan in advance of the ERCOT deployment instruction, and thereby avoided the protocol violation in the first instance.

Moreover, we find it significant that CPS Energy's own witnesses testified that when the CT5 first failed to deploy, the control room operator received an alarm indicating that a tempering air fan discharge damper had failed to open, thereby alerting the operator to the particular problem. As CPS Energy was on notice there problem with the damper fan, it is unclear why CPS Energy did not direct one of the eight operators already at the plant to physically walk to the unit to inspect the fan. This is particularly curious, as the record indicated that at least three of these operators were expressly tasked with the job of walking around the plant site throughout the cold weather event to inspect equipment for freeze damage. Having been alerted to the problem with the fan for over an hour before Warnke arrived at the plant and knocked the ice off the damper, it is unclear why CPS admittedly did not send one of these operators to the unit earlier to view the fan to determine if it was perhaps suffering from freeze damage, which was a distinct possibility in

43

light of the weather conditions.

We also find it significant that although CPS Energy claims that the two technicians at the plant site were too busy with other tasks to investigate the problems with the CT5, Warnke testified that when he first arrived at the plant, the two technicians took the time to speak with him about the problems with the CT5 before Warnke walked out to the unit.   In sum, at best, the record is in conflict regarding whether those technicians were unavailable to inspect the CT5 unit to determine if the damper fan was frozen.

We therefore conclude that the record adequately demonstrates that at several points in time during the morning of February 2, CPS Energy had various options at its disposal, which were within its reasonable control, to prevent and address the equipment failure, yet it failed to exercise any of those options.   Because an equipment failure is excused only for as long as it is beyond a market participant's control, we conclude that any excuse CPS Energy could have initially relied upon when the equipment first failed expired long before Warnke arrived at the scene to address the problem over an hour after CPS was alerted to the problem.

Accordingly, we conclude there was substantial evidence to support the PUC's decision that CPS Energy failed to carry its burden of proving that the equipment failure on the morning of February 2, 2011 was "beyond its reasonable control," and that the PUC therefore properly determined that CPS Energy was not excused from the ERCOT protocol under subsection (f) of the WMO Rule on that basis.   Issue Two is overruled.

**Issue Three:   Whether CPS Energy was Excused from Complying with the ERCOT Protocols Based on the Health, Safety, and Environment Excuses in the WMO Rule**

CPS Energy also relied on two other excuses found in subsection (f)(2)(C) of the WMO Rule.   First, it relied on the provision in the Rule that allows a market participant to be excused

from compliance with an ERCOT protocol "if compliance would jeopardize public health and safety or the reliability of the ERCOT transmission grid, or create risk of bodily harm or damage to the equipment[.]" 16 TEX. ADMIN. CODE § 25.503(f)(2)(C). Second, it relied on the related provision that a market participant is excused from compliance with an ERCOT protocol if "compliance would be inconsistent with facility licensing, environmental, or legal requirements[.]" *Id.*

CPS Energy contends that it presented undisputed evidence at the hearing that the events that occurred on the morning of February 2 fit within both of these excuses. In particular, it contends that it presented undisputed evidence that the Braunig CT5 unit failed to deploy on the morning of February 2 because the damper fan would not open, and that if it had attempted to operate the unit without the damper fan, this would have created a serious risk of an explosion, posing serious health and safety issues, destruction of the unit, and possible air pollution issues, which would have, in turn, caused CPS Energy to be in violation of air quality standards or its TCEQ-issued air permits.

The PUC, however, expressly concluded that CPS Energy could not rely on these exceptions, primarily because it found that there was no danger of any of these risks occurring, since the unit contained a built-in safety system ensuring that the unit would automatically shut down when it detected a safety risk, just as it did on the morning of February 2. CPS Energy, on the other hand, finds it irrelevant that the unit had a built-in safety system, pointing out that the evidence established that a CPS operator could have overridden the control system, and forced the unit to operate without the damper fan. CPS Energy points out that the record established that if the operator had done so, and the unit had started without an operating damper fan, this would have

45

created the very risk to public safety and the environment that subsection (f) sought to avoid. According to CPS Energy, the PUC's "treatment of this undisputed evidence turns the WMO Rule on its head," and in effect, would require a market participant to comply with an ERCOT protocol regardless of the risk it might pose, thereby essentially eviscerating the entire excuse provisions contained in subsection (f).

There is nothing in the record, however, to indicate that the control room operator made any attempt to override the safety system, or that the ERCOT operator ever suggested that he do so. In reality, no safety concerns existed at the time ERCOT gave its instruction to deploy the unit, or at any time thereafter when the operator was attempted to start the system. Further, overriding the safety system was not CPS Energy's only option to avoid the protocol violation. It had other means at its disposal to comply with the ERCOT protocol. CPS Energy staff could have tested or inspected the CT5 unit prior to the anticipated deployment time, which would have given it sufficient time to address the problem with the frozen damper prior to the anticipated ERCOT deployment instruction. Moreover, once the control room operator received the alarm indicating that the damper fan had failed to open, CPS Energy was on notice it needed to take all reasonable steps to determine the cause of the failure. We find it significant, as the PUC did, that due to inadequate staffing, CPS Energy was unable or unwilling to take any steps to determine the cause of that failure until over an hour later when Warnke finally arrived at the plant site to inspect the fan.

CPS Energy also objects that in reaching its conclusion, the ALJ interpreted the WMO Rule to imply an "element" requiring a market participant "to have taken all reasonable steps" to avoid a WMO Rule violation before the market participant is entitled to rely on the excuse

46

provisions set forth in that Rule.  In particular, CPS Energy points out that the ALJ found that CPS Energy had not taken all reasonable steps to avoid the ERCOT protocol violation due to its failure to adequately staff its plant in anticipation of the cold weather event, and therefore concluded that CPS Energy was not allowed to rely on the subsection (f) excuses.

CPS Energy contends this was an erroneous interpretation and "unsound" application of the WMO Rule, contrary to the Rule's plain language.  According to CPS Energy, the plain language of the Rule makes it clear that the "only relevant factual determination" to be made in applying this excuse provision is whether a market participant's compliance with the ERCOT instruction would have posed one of the enumerated dangers to safety, bodily harm, and equipment.  In CPS Energy's opinion, the PUC's decision, in allegedly adding a new element to the excuse provision in the Rule, was improper and exceeded its authority.  CPS Energy also contends that this was a new or novel interpretation of the Rule, and that CPS Energy was therefore not on notice of this interpretation prior to the enforcement proceeding, contending that it was once again thereby deprived of "fair notice" of the type of conduct that was expected of it in this situation.  We disagree.

First, when a rule is ambiguous or otherwise leaves room for policy determinations, we defer to the agency's interpretation if the interpretation is reasonable.  *CenterPoint Energy Houston Elec., LLC,* 408 S.W.3d at 916-17 (*citing Rodriguez*, 997 S.W.2d at 254–55); *see also City of El Paso v. Pub. Util. Comm'n of Texas,* 344 S.W.3d at 618-19.  Second, when an administrative rule or statute is unambiguous, it must be interpreted based on its plain language, but not if such an interpretation would produce an absurd result.  *Fleming Foods of Tex., Inc.,* 6 S.W.3d at 284; *State,* 246 S.W.3d at 332.

In the present case, regardless of whether the WMO Rule is ambiguous, we believe there is room for the PUC to make the policy determination that a market participant is obligated to exercise due diligence in meeting its duty to comply with an ERCOT protocol before it should be allowed to raise an excuse from compliance based on health, safety, or environmental concerns. As the PUC points out, to interpret the WMO Rule otherwise would lead to the absurd result that a market participant could seek to excuse a failure to comply with an ERCOT protocol or an ERCOT instruction to deliver power, based on a health or safety risk, even if that very risk was caused by the market provider's own negligence in not maintaining its equipment or in failing to adequately staff its plant. As the PUC points out, the excuses set forth in the WMO Rule do not give market providers a "free pass" to act with negligence in violating ERCOT protocols or instructions, and to later claim an excuse of this nature; instead the market participant must act with due diligence to avoid the potential violation in the first place.

Contrary to CPS Energy's claim, this interpretation is not unreasonable, and instead promotes the very goals the Legislature sought to achieve in adopting the regulatory and enforcement scheme set forth in PURA, *i.e.*, to ensure the "reliability and adequacy of the regional electrical network," and to ensure that market participants comply with ERCOT protocols in furtherance of that goal. TEX. UTIL. CODE ANN. §§ 39.151(a, c), 39.1515(a, c). Any interpretation to the contrary would essentially allow a market participant to avoid an enforcement proceeding regardless of whether its negligent conduct adversely affected the reliability of the grid, and would be contrary to the legislative intent of ensuring the grid's reliability. Therefore, we conclude the PUC's interpretation of its own rule was reasonable.

Moreover, we disagree with CPS Energy's contention that the PUC adopted a new or novel

48

interpretation of the WMO Rule when it read an element of "diligence" into the Rule's excuse provisions. Instead, as pointed out above, the Austin Court spoke on this issue over ten years ago in *TXU Generation*, when it advised market participants that in the final analysis, the WMO Rule requires market participants to be guided at all times by the concept of "diligence." *TXU Generation,* 165 S.W.3d at 840.

CPS Energy seeks to rely on the health, safety, and environmental excuses set forth in the WMO Rule on the ground its Braunig CT5 Unit failed to deploy due to a safety issue related to the damper fan's failure to open, which could have caused the unit to explode or otherwise be damaged if the unit was operated under those conditions. However, this safety issue could have been avoided if CPS Energy had exercised due diligence prior to the initial startup by having its staff test or inspect the unit before the anticipated time the ERCOT deployment instruction was given. Further, even if the safety excuse was valid when the initial startup sequence was first interrupted by the safety feature in the unit, CPS Energy's duty to ERCOT did not end at that point. Instead, its duty to ensure that the CT5 unit timely deployed was continuing in nature. Thus, once the control room operator received the signal that the unit had shut down because the damper fan had failed to open, alerting it that a safety issue existed, it was incumbent upon CPS Energy to exercise due diligence to address that problem as quickly as possible, so that it could, in turn, comply with the ERCOT instruction to deploy the unit in a timely manner.

Requiring CPS Energy to take reasonable steps not only to prevent but also to address safety issues once they arise, and to do so as quickly and as diligently as possible, is both reasonable and consistent with the plain language of the WMO Rule, which allows the market participant to rely on an excuse only for as long as the "condition continues." 16 TEX. ADMIN.

49

CODE § 25.503 (f)(2)(C). This language is a clear warning to market participants that they must exercise due diligence to detect and correct any underlying problems that may be causing an excuse—in this case, the damper fan's failure to open—as quickly as possible to ensure that they are able to meet their ERCOT obligations within a reasonable timeframe. It would lead to an absurd result if the WMO Rule were interpreted otherwise, as market participants would then be able to rely on an excuse for as long as they might chose, without taking any steps to come into compliance with the Rule within a reasonable timeframe.

Yet, CPS Energy essentially did just that the morning of February 2, waiting for over an hour to take any reasonable steps to investigate the cause of the damper fan's failure to open, either because it did not have adequate staff to do so, or because it chose not to assign its available staff to perform that task. Either way, at that point, the PUC was entitled to make the determination that CPS Energy was no longer entitled to rely on any of the excuse provisions contained in the WMO Rule due to its own lack of due diligence.

Accordingly, we conclude that the PUC did not erroneously interpret the WMO Rule, and that it properly rejected CPS Energy's claim that it was excused from compliance with the ERCOT protocol for any health, safety, or environmental concerns. Issue Three is overruled.

**Issue Four: Whether CPS Energy was Excused from Complying with the ERCOT Protocols Based on the Exemptions found in the Protocols themselves**

In its last issue, CPS Energy claims that it should be excused from complying with the ERCOT protocols based on the exemptions found in the protocols themselves, which CPS Energy refers to as "trump" provisions. CPS Energy contends that these exemptions are "safe harbor" provisions, and that in effect, if a market participant comes within one of these provisions, it cannot be said to have violated another separate ERCOT protocol. While we agree that these

50

protocols could, if applicable, exempt a market participant from compliance with another ERCOT protocol or instruction, we do not agree that these protocols provide CPS Energy with any relief in this case.

## *The Operating Limits Protocol*

First, CPS Energy cites to what it refers to as the "operating limits" protocol:

> ERCOT shall consider all equipment operating limits when issuing Dispatch Instructions. Except as stated in Section 6.5.9 Emergency Operations, if a Dispatch Instruction conflicts with a restriction that may be placed on equipment from time to time by a TSP, a DSP, or a Generation Resource's QSE to protect the integrity of equipment, ERCOT shall honor the restriction.

ERCOT Protocol 6.5.3.(1). CPS Energy believes that its actions on February 2 came within this "exemption," because the CT5 unit failed to deploy due to a "restriction" that was placed on the unit—apparently referring to the automated safety system that caused the unit to automatically shut down on the morning of February 2, when it detected a safety issue. The PUC, on the other hand, contends that this protocol is inapplicable to the facts of this case. We agree with the PUC.

We note that this particular subsection comes under the Protocol Section, entitled, "Equipment Operating Ratings and Limits." ERCOT Protocol 6.5.3. Two subsections are contained within this protocol. The first, which CPS Energy cites, deals with "equipment operating limits" and relates to "restrictions" that the market participant itself has placed on its own equipment to ensure the safety of its equipment. In turn, the second subsection in the protocol provides a list of these various limits, which relate to a generating unit's operating capabilities.[9] ERCOT Protocol 6.5.3.(2). The second subsection specifically provides that a

---

[9] In particular, this second protocol provides that: "Each TSP shall notify ERCOT of any limitations on the TSP's system that may affect ERCOT Dispatch Instructions. ERCOT shall continuously maintain a posting on the MIS Secure Area of any TSP limitations that may affect Dispatch Instructions. Examples of such limitations may include: temporary changes to transmission or transformer ratings, temporary changes to range of automatic tap position

51

market participant must "notify ERCOT of any limitations on the [participant's] system that may affect ERCOT Dispatch Instructions," and then requires ERCOT to "continuously maintain a posting on the MIS Secure Area of any . . . limitations that may affect Dispatch Instructions." *Id*.

As the PUC points out, these operating protocols are not applicable to the present situation. When the CT5 unit failed to deploy, it was not because CPS Energy was addressing any issues involving the type of "equipment operating limits" contemplated by these protocols. In other words, CPS Energy had not placed any "restrictions" on its equipment of the type contemplated. Further, as required by the protocol itself, CPS Energy did not notify the PUC of any "equipment operating limits" described by those protocols. As such, we reject CPS Energy's claim that it was entitled to rely on this protocol to excuse its compliance with the ERCOT instruction on the morning of February 2.[10]

### *The Compliance Protocol*

Second, CPS Energy cites to what it refers to as the "compliance" protocol:

> Except as otherwise specified in this Section, each TSP and each QSE shall comply fully and promptly with a Dispatch Instruction issued to it, unless in the sole and reasonable judgment of the TSP or QSE, such compliance would create an undue threat to safety, undue risk of bodily harm or undue damage to equipment, or the Dispatch Instruction is otherwise not in compliance with these Protocols.

ERCOT Protocol 6.5.7.9(1). CPS Energy contends that its actions on February 2 came within the clear language of this protocol, because it could not comply with the ERCOT instruction to deploy the Braunig CT5 unit due to safety concerns, and because the risk that deploying the unit, without

_____

capabilities on auto-transformers, fixing or blocking tap changer, changes to no-load tap positions or other limitations affecting the delivery of energy across the ERCOT Transmission Grid. Any conflicts that cannot be satisfactorily resolved may be brought to ERCOT by any of the affected Entities for investigation and resolution."

[10] CPS Energy argues that because Protocol 6.5.3 does not itself contain a notice provision, we should not conclude that any such notice was required. However, as noted above, these two protocols are found within the same section and must be read together.

a functioning damper fan, would have caused bodily harm or undue damage to equipment. The PUC points out, however, that this protocol by its plain language applies only when the market participant makes a decision based on its "sole and reasonable judgment" that compliance with an ERCOT instruction would cause a risk of that nature. In the present case, CPS Energy made no such judgment to refuse to comply with the ERCOT instructions. Instead, after the CT5 unit had automatically shut down when it detected a damper fan malfunction, CPS Energy continued to try to deploy the unit, and made two additional failed attempts to start it, with no apparent concern that it might need to investigate any safety issues before doing so. As such, it cannot be said that CPS Energy used its "sole and reasonable judgment" not to comply with the ERCOT protocol that morning due to any safety concerns.

More importantly, however, we note that CPS Energy failed to notify ERCOT that it was relying on this provision on the morning in question, as required by ERCOT Protocol 6.5.7.9(2), which provides:

> If the recipient of a Dispatch Instruction does not comply because in the sole and reasonable judgment of the TSP or QSE, such compliance would create an undue threat to safety, undue risk of bodily harm, or undue damage to equipment, then the TSP or QSE must immediately notify ERCOT and provide the reason for non-compliance.

CPS Energy contends that this notice provision is inapplicable to the compliance protocol, apparently believing that it is in an entirely separate and unrelated protocol, and that it would be improper to read the two provisions in conjunction. We disagree. Both of these provisions are found under the heading "Compliance with Dispatch Instructions," and are simply subsections of ERCOT Protocol 6.5.7.9. The first subsection provides the exemption itself, and the second subsection, mirroring the exemption language used in the first subsection, expressly requires

53

market participants relying on the first subsection to provide notice to ERCOT of its intent to do so. It is therefore obvious that these two provisions must be read together.

CPS Energy next contends that even if it were required to provide notice under this protocol, it did in fact give sufficient notice to ERCOT during the conversation its control room operator had with the ERCOT operator on the morning of February 2, when it first reported the unit's failure to deploy. In particular, CPS Energy points out that its control room operator advised the ERCOT operator that the unit was "tripping offline," and that the reason for the failed start was "low tempering pressures." CPS Energy contends that this should be considered sufficient notice that a safety issue existed, and that its operator should not have been required to provide the ERCOT operator with a detailed "legalese" account of the failure. CPS Energy further contends that requiring a market participant to provide a detailed description of a safety issue in order to invoke this protocol is an unreasonable interpretation of the protocol, pointing out that fully developed information about a generation unit failure is rarely available in real time, and that in an emergency situation, a market participant operator will rarely have the ability to provide detailed information about a safety issue to an ERCOT operator on a contemporaneous basis.

We agree that the ERCOT protocol does not require the market participant to provide a highly detailed account of a safety issue during an emergency situation, any more than it requires an ERCOT operator to be clairvoyant in attempting to discern whether a market participant is attempting to rely on the exemption in the protocol. Instead, what the rule does require, by its plain language, is a clear communication from the market participant to ERCOT that it is failing or refusing to comply with an ERCOT instruction because it has made a reasonable judgment that doing so would create an undue safety threat or risk of harm. As set forth above, CPS Energy did

54

not notify ERCOT that it had made any such a judgment because, in point of fact, it had not made such a judgment. Instead, the undisputed evidence demonstrated that the CPS Energy control room operator agreed with the ERCOT operator to continue trying to start the unit, and expressed no concern to the ERCOT operator that doing so might cause any type of safety or health risk. These continued attempts to start the unit, before addressing the root cause of the startup failure over an hour later, undercuts any contention that CPS Energy believed, in its reasonable judgment, that continuing to try to start the unit in compliance with ERCOT instructions would have in fact created any undue safety risks.

Accordingly, we conclude that CPS Energy was not entitled to rely on the provisions of the compliance protocol to exempt it from liability for violating the WMO Rule. Issue Four is overruled.

## CONCLUSION

The trial court's judgment is affirmed.


STEVEN L. HUGHES, Justice

November 30, 2016

Before Rodriguez, J., Hughes, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), sitting by assignment